29 P.3d 351

STATE of Hawai'I, Petitioner–Appellee,

v.

Willie JONES, also known as "Willis," Respondent–Appellant.

No. 20543.

Supreme Court of Hawai'i.

July 19, 2001.

As Amended Aug. 30, 2001.

James M. Anderson, Deputy Prosecuting Attorney, for petitioner-appellee, on the writ.

Edwin Lauder Baker, Honolulu, for respondent-appellant.

MOON, C.J., LEVINSON, NAKAYAMA, and RAMIL, JJ., and Circuit Judge BLONDIN, in Place of ACOBA, J., Recused.

Opinion of the Court by MOON, C.J.

On September 4, 1996, following a circuit court jury trial, respondent-appellant Willie Jones (Defendant) was convicted of: (1) one count of sexual assault in the second degree, in violation of Hawai'i Revised Statutes (HRS) § 707–731(1)(a) (1993) [1] (Count I); (2) one count of attempted sexual assault in the second degree, in violation of HRS §§ 705–500 (1993) [2] and 707–731(1)(a) (Count II); (3) one count of sexual assault in the fourth degree, in violation of HRS § 707–733(1)(b) (1993) [3] (Count III); and (4) two counts of sexual assault in the fourth degree, in violation of HRS § 707–733(1)(a) (1993) (Counts IV and V). Defendant appealed his convic-

---

1. HRS § 707–731(1)(a) states in pertinent part that "[a] person commits the offense of sexual assault in the second degree if ... [t]he person knowingly subjects another person to an act of sexual penetration by compulsion[.]"

2. HRS § 705–500 states, in pertinent part:
    **Criminal attempt.** (1) A person is guilty of an attempt to commit a crime if the person:
    (a) Intentionally engages in conduct which would constitute the crime if the attendant circumstances were as the person believes them to be; or
    (b) Intentionally engages in conduct which, under the circumstances as the person believes them to be, constitutes a substantial step in a course of conduct intended to cul-

minate in the person's commission of the crime[.]

3. HRS § 707–733 states in pertinent part:
    **Sexual assault in the fourth degree.** (1) A person commits the offense of sexual assault in the fourth degree if:
    (a) The person knowingly subjects another person to sexual contact by compulsion or causes another person to have sexual contact with the actor by compulsion;
    (b) The person knowingly exposes the person's genitals to another person under circumstances in which the actor's conduct is likely to alarm the other person or put the other person in fear of bodily injury[.]

tions. The ICA vacated Defendant's convictions of Counts I through IV, holding that the trial court erred in instructing the jury regarding consent and that jury unanimity as to the verdicts was required. See *State v. Jones*, 97 Haw. 23, 32 P.3d 1097 (1998). The ICA also reversed Defendant's conviction of Count V after the prosecution conceded that there was no evidence in support thereof. *See id.*

We granted petitioner-appellee State of Hawaii's (the prosecution) application for a writ of certiorari to review the decision of the ICA. We agree with the ICA that the trial court reversibly erred in instructing the jury. However, in light of our decision in *State v. Klinge*, 92 Hawai'i 577, 994 P.2d 509, *reconsideration denied*, 92 Hawai'i 577, 994 P.2d 509 (2000), and, because the ICA misapplied this court's holding in *State v. Arceo*, 84 Hawai'i 1, 928 P.2d 843 (1996), we write to clarify the ICA's analysis.

## I. *BACKGROUND*

The background facts are set forth in detail in the ICA's opinion, *see Jones*, 97 Haw. at 24–25, 32 P.3d at 1098–99, which we will not repeat here. However, the relevant facts for purposes of our clarification of the ICA's analysis are briefly stated below and presented in more detail in the discussion section, *infra.*

In July 1994, Complainant, who was then fourteen-years-old, her family, and some of her friends developed a friendship with Defendant, who was then thirty-six-years old. During their friendship, Complainant and Defendant discussed Complainant's interest in modeling and how Defendant could help her begin a career.

Complainant testified that, during the course of an outing with Defendant to the beach, his hotel swimming pool, and his hotel room sometime in July or August 1994, Defendant: (1) touched her leg and her right breast, as well as exposed his genitals, while they were sitting in Defendant's car; (2) pulled Complainant's bathing suit to the side

and "tr[ied] to stick his penis" into her vagina while swimming in the hotel pool; and (3) pulled down her sweat shorts and inserted his penis into her vagina three times while she was in the bathroom of Defendant's hotel room. Complainant also testified that, when Defendant made sexual advances toward her, she tried to avoid him or push him away.

Defendant was subsequently indicted on six counts of sexual assault for the following acts: Count I for sexual assault in the second degree (sexual penetration in the hotel room); Count II for attempted sexual assault in the second degree (attempted sexual penetration in the pool); Count III for sexual assault in the fourth degree (exposure of genitals in the car); Count IV for sexual assault in the fourth degree (placing hand on Complainant's breast in the car); Count V for sexual assault in the fourth degree (placing penis on Complainant's vagina in the hotel room); and Count VI for sexual assault in the fourth degree (placing hand on Complainant's vagina in the hotel room).[4]

During closing arguments, Defendant argued that Complainant had consented to his sexual advances. The prosecution, on the other hand, argued that the evidence showed Complainant's lack of consent and also focused on Complainant's youth, arguing that Defendant was a con artist who took advantage of a young girl.

At the settling of jury instructions, the parties agreed to the following consent instruction, which was given by the court:

In any prosecution, the complaining witness's consent to the conduct alleged or to the result thereof, is a defense if the consent negatives an element of the offense or precludes the infliction of the harm or evil sought to be prevented by the law defining the offense.

Consent is not a defense if:

(1) It is given by a person who is legally incompetent to authorize the conduct alleged [hereinafter, Ground 1]; or

---

4. At the close of the prosecution's case-in-chief, Defendant moved for judgment of acquittal on all counts, which the trial court denied, except as to Count VI, which the court granted.

(2) It is given by a person who by reason of youth,[5] mental disease, disorder, or defect, or intoxication is manifestly unable or known by the defendant to be unable to make a reasonable judgment as to the nature or harmfulness of the conduct alleged [hereinafter, Ground 2]; or

(3) It is given by a person whose consent is sought to be prevented by the law defining the offense [hereinafter, Ground 3]; or

(4) It is induced by force, duress, or deception [hereinafter, Ground 4].

The burden is upon the prosecution to prove beyond a reasonable doubt that the complaining witness did not consent to the conduct alleged or the result thereof. If the prosecution fails to meet its burden, then you must find the defendant not guilty.

After deliberations, the jury returned guilty verdicts as to Counts I through V, and Defendant timely appealed.

On appeal before the ICA, Defendant argued, *inter alia*, that his convictions and sentences should be reversed because: (1) the trial court committed plain error by including Grounds 1 and 3 in the consent instruction because there was no rational basis in the evidence to support such an instruction; (2) the trial court committed plain error by failing to provide the jury with a specific unanimity instruction with respect to Count I, advising the jury that all twelve of its members must agree that the same underlying culpable act had been proved beyond a reasonable doubt; and (3) Defendant was denied the effective assistance of counsel based on trial counsel's failure to ensure that the jury was properly instructed.

The ICA agreed that the trial court erroneously instructed the jury regarding consent with respect to Counts I through IV.[6] Specifically, the ICA held that,

"[I]neffective consent" in a criminal case as set forth in Hawai'i Revised Statutes (HRS) § 702–235 (1993) is an attendant circumstance of the offense to which it is attributed and therefore a material element which must be proven beyond a reasonable doubt by the prosecution. We further hold that because there are four potential grounds upon which ineffective consent may be found, the jury must be informed that its decision must be unanimous as to at least one of these grounds before it may render a verdict of guilty on the offense involved. We also conclude that where the jury is instructed that a defendant's criminal liability may be based on the lack of consent of the complaining witness (the complainant) and is also instructed on ineffective consent, the jury must be advised that these bases for criminal liability are mutually exclusive. Thus, the jurors must reach unanimity on one of them as the basis for criminal liability as to the offense concerned. Because the ineffective consent instruction of the first circuit court (the court) failed to inform the jury of the foregoing propositions, the instruction was prejudicially erroneous.

*Jones*, 97 Haw. at 24, 32 P.3d at 1098. Accordingly, the ICA vacated Defendant's convictions as to Counts I through IV and remanded the case for a new trial on those counts.

On November 17, 1998, we granted the prosecution's timely petition for a writ of certiorari, wherein the prosecution argues that the ICA erred in vacating Defendant's convictions. The prosecution concedes that the ineffective consent instruction was erroneously given because the instruction was inapplicable to the evidence adduced. However, the prosecution maintains that the inclusion of the ineffective consent instruction did not contribute to the verdict because there was sufficient evidence that Complain-

---

**5.** We note here that, pursuant to the strict liability offense defined in HRS § 707–732(1)(b) (1993), when the complainant is *less than* fourteen years old, the defendant's knowledge of the complainant's "youth" and the issue of the complainant's consent are irrelevant. Because Complainant in this case was fourteen years of age, Defendant was not charged with the strict liabili-

ty offense, and, therefore, HRS § 707–732(1)(b) is inapplicable.

**6.** As previously stated, the ICA reversed Defendant's conviction and sentence as to Count V based upon the prosecution's concession that the trial court erroneously denied Defendant's motion for judgment of acquittal on that count.

ant did not consent to Defendant's conduct in the first place. The prosecution also contends that the ICA misapplied this court's holding in *State v. Arceo*, 84 Hawai'i 1, 928 P.2d 843 (1996), and that jury unanimity was not required in this case.

## II. STANDARDS OF REVIEW

### A. Statutory Interpretation

■ " 'The interpretation of a statute is a question of law reviewable *de novo*.' " *State v. Klinge*, 92 Hawai'i 577, 584, 994 P.2d 509, 516 (quoting *State v. Kotis*, 91 Hawai'i 319, 327, 984 P.2d 78, 86 (1999) (citations omitted)), *reconsideration denied*, 92 Hawai'i 577, 994 P.2d 509 (2000).

### B. Jury Instructions

■ In the instant case, Defendant's trial counsel agreed to the jury instructions as given and, thus, invited the error of which Defendant now complains. The ICA, stating that, ultimately, the trial court is responsible for properly instructing the jury, concluded that the erroneous instructions prejudiced Defendant and amounted to plain error by the trial court. *Jones*, 97 Haw. at 30, 32 P.3d at 1104 (citing *State v. Feliciano*, 62 Haw. 637, 643, 618 P.2d 306, 310 (1980)). An error is deemed plain error if the substantial rights of the defendant have been affected adversely. *See State v. Vanstory*, 91 Hawai'i 33, 42, 979 P.2d 1059, 1068 (1999).

■ We acknowledge that, generally, invited errors are not reversible. *See State v. Puaoi*, 78 Hawai'i 185, 189, 891 P.2d 272, 275 (1995). However, on appeal before the ICA, Defendant argued that he was denied effective assistance of counsel based on, *inter alia*, defense counsel's failure to ensure that the jury was properly instructed. Specifically, Defendant contends that the ineffective consent instruction agreed to by trial counsel was not supported by the evidence adduced and that this error prejudiced Defendant.

When an ineffective assistance of counsel claim is raised, the defendant has the burden of establishing: "1) that there were specific errors or omissions reflecting counsel's lack of skill, judgment, or diligence; and 2) that such errors or omissions resulted in either the withdrawal or substantial impairment of a potentially meritorious defense." *State v. Fukusaku*, 85 Hawai'i 462, 479–80, 946 P.2d 32, 49–50 (1997) (citations omitted).

■ Whether we review the jury instructions in this case for plain error by the trial court or as an ineffective assistance of counsel claim, the ultimate question is whether the erroneous instructions prejudiced Defendant's rights. Here, the prosecution has conceded that the ineffective consent instruction was erroneously given.[7] Indeed, "erroneous instructions are presumptively harmful and are a ground for reversal unless it affirmatively appears from the record as a whole that the error was not prejudicial." *State v. Valentine*, 93 Hawai'i 199, 204, 998 P.2d 479, 484 (2000) (citations omitted). However, the error

is not to be viewed in isolation and considered purely in the abstract. It must be examined in the light of the entire proceedings and given the effect which the whole record shows it to be entitled. In that context, *the real question becomes whether there is a reasonable possibility that error may have contributed to conviction.*

If there is such a reasonable possibility in a criminal case, then the error is not harmless beyond a reasonable doubt, and the judgment of conviction on which it may have been based must be set aside.

*Id.* (emphasis added) (citations omitted).

## III. DISCUSSION

■ The key issue presented in this case is whether the consent instruction was prejudicially erroneous because: (1) the jury was instructed that it could find Defendant guilty based on either of two alternative theories of

---

7. As discussed *infra*, our independent review of the record and relevant case law supports the prosecution's confession of error. *See State v. Hoang*, 93 Hawai'i 333, 336, 3 P.3d 499, 502 (2000) (recognizing that, even when the prosecutor concedes error, it is incumbent on the appellate court to ascertain whether the confession of error is supported by the record and well-founded in law).

guilt based on the lack of legal consent—either (a) that Complainant did not consent to the conduct, or (b) that Complainant consented, but her consent was legally ineffective (based on any of the four grounds of ineffective consent); (2) it is impossible to ascertain the theory of guilt upon which the jury rested its guilty verdict because the jury was not instructed that it must be unanimous as to one of the theories; and (3) there was legally insufficient evidence to support the ineffective consent theory.

The prosecution concedes that the trial court's instruction as to ineffective consent was erroneously given because there was insufficient evidence to support such an instruction, but maintains that the error was harmless. The prosecution argues that, inasmuch as the ineffective consent instruction was clearly inapplicable and there was strong evidence that Complainant did not consent, the error did not contribute to the verdict. However, the prosecution also acknowledges and the record reflects that there was *some* evidence and argument to the jury supporting some of the grounds of ineffective consent. Because it is possible that the jury incorrectly believed that it could convict Defendant based on a finding of ineffective consent, despite the lack of legally sufficient evidence, *see* discussion *infra*, we agree with the ICA that the consent instruction as given was prejudicially erroneous, affecting Defendant's substantial rights. However, we granted the prosecution's application for certiorari to clarify the ICA's analysis.

### A. Counts I through IV

#### 1. General Principles

HRS § 702–205 (1993) defines the "elements of an offense" as:

such (1) conduct, (2) attendant circumstances, and (3) results of conduct, as:

(a) *Are specified by the definition of the offense,* and

(b) *Negative a defense* (other than a defense based on the statute of limita-

tions, lack of venue, or lack of jurisdiction).

(Emphases added.) Further, HRS § 701–114 (1993) provides that no person may be convicted of an offense without proof beyond a reasonable doubt of *each element* of the offense. As discussed below, the lack of legal consent was an element of each of the offenses in Counts I, II, III, and IV.

Because "compulsion" is an element of each of the crimes charged in Counts I, II, and IV, the prosecution had the burden of proving that Defendant committed the culpable acts "by compulsion." HRS §§ 707–731(1)(a) and 707–733(1)(a).[8] The definition of compulsion includes the "absence of consent." HRS § 707–700 (1993).[9] Thus, with respect to Counts I, II, and IV, the "absence of consent" is an element of the offense "specified by the definition of the offense," HRS § 702–205(a), and was required to be proven beyond a reasonable doubt by the prosecution.

With respect to Count III, the prosecution must prove that Defendant "knowingly expose[d][his] genitals to [Complainant] under circumstances in which [his] conduct [was] *likely to alarm the [Complainant] or put the [Complainant] in fear of bodily injury* [.]" HRS § 707–733(b) (emphasis added). HRS § 702–233 (1993) provides that:

In any prosecution, the [victim's] consent to the conduct alleged, or to the result thereof, is a defense *if the consent negatives an element of the offense or precludes the infliction of the harm or evil sought to be prevented by the law defining the offense.*

(Emphasis added.) Clearly, consent negatives the element that Defendant's "conduct [was] likely to alarm [Complainant] or put [her] in fear of bodily injury." *Id.* Consent, therefore, is a defense to Count III, and, pursuant to HRS § 702–205(b), the prosecution had the burden of negating the defense of consent.

---

8. *See supra* notes 1 and 3.

9. HRS § 707–700 provides that " '[c]ompulsion' means the absence of consent, or a threat, express or implied, that places a person in fear of

public humiliation, property damage, or financial loss." The prosecution's theory of the case, however, focused upon the absence of consent.

In the context of this case, there were two possible ways for the prosecution to meet its burden of negating the defense of consent. The first way—the prosecution's primary theory—was to prove that Complainant did not consent at all, i.e., "the absence of consent." The second way was to prove that, even if Complainant consented, such consent was ineffective. HRS § 702-235 (1993) provides that consent is *not* a defense if:

(1) It is given by a person who is legally incompetent to authorize the conduct alleged [Ground 1]; or

(2) It is given by a person who by reason of youth, mental disease, disorder, or defect, or intoxication is manifestly unable or known by the defendant to be unable to make a reasonable judgment as to the nature or harmfulness of the conduct alleged [Ground 2]; or

(3) It is given by a person whose improvident consent is sought to be prevented by the law defining the offense [Ground 3]; or

(4) It is induced by force, duress or deception [Ground 4].

The commentary to HRS § 702-235 provides that "[t]his section deprives the defendant of a defense based on consent in those situations where the [victim's] *apparent* consent is actually meaningless." Commentary to HRS § 702-235 (emphasis added). Further, "[f]acts which deprive consent of its effectiveness negative a defense, thereby making them elements of the offense." *Id.*

Moreover, Hawaii's case law recognizes that ineffective consent, if proven, also renders consent meaningless where the absence of consent is an element of the crime specified in the definition of the offense. *See State v. Oshiro,* 5 Haw.App. 404, 408, 696 P.2d 846, 850 (1985) ("[I]f consent as a defense is subject to the ten qualifications of HRS § 702-235, then [lack of] consent as an element is similarly restricted."). Thus, with respect to each of Counts I, II, III, and IV, the attendant circumstance of lack of legal consent was an element of the charged offense, *see* HRS § 702-205, and the prosecution could prove that element by establishing (1) that Complainant did not consent ("absence of consent") or (2) that any "apparent" consent was ineffective pursuant to HRS § 702-235 ("ineffective consent"). As discussed in section III.B., *infra,* we must determine whether the jury was required to reach a unanimous verdict as to the particular mode of proving the element of lack of legal consent.

## 2. Jury Instructions

▇▇▇▇▇ With respect to jury instructions, "[i]t is a grave error to submit a [criminal] case to a jury without accurately defining the offense charged and its elements. Accordingly, the jury may not be instructed in a manner that would relieve the prosecution of its burden of proving every element of the offense charged." *State v. Jenkins,* 93 Hawai'i 87, 108, 997 P.2d 13, 34 (2000) (citations and footnote omitted). Further, "where . . . the jury has been given instructions on a defense other than an affirmative defense,[10] but has not been instructed that the prosecution bears the burden of proof beyond a reasonable doubt with respect to negativing that defense, substantial rights of the defendant may be affected and plain error may be noticed." *Raines v. State* 79 Hawai'i 219, 225, 900 P.2d 1286, 1292 (1995); *see also* HRS § 701-115 (1993).

▇▇▇▇ In its application, the prosecution seems to argue that Defendant was not entitled to an instruction on the defense of consent. However,

[o]ur cases have firmly established that a defendant is entitled to an instruction on every defense or theory of defense having any support in the evidence, provided such evidence would support the consideration of that issue by the jury, no matter how weak, inconclusive, or unsatisfactory the evidence may be. *State v. Sawyer,* 88 Hawai'i 325, 333, 966 P.2d 637, 645 (1998)

10. Pursuant to HRS § 701-115(3) (1993), "[a] defense is an affirmative defense if: (a) It is specifically so designated by the Code or another statute; or (b) If the Code or another statute plainly requires the defendant to prove the defense by a preponderance of the evidence." An affirmative defense is not one that the prosecution is required to negative as an element of the offense. *See State v. Anderson,* 58 Haw. 479, 484–85, 572 P.2d 159, 163 (1977).

(quoting *State v. Kaiama*, 81 Hawai'i 15, 24, 911 P.2d 735, 744 (1996)[).]

*State v. Cabrera*, 90 Hawai'i 359, 370, 978 P.2d 797, 808 (1999) (some citations and internal quotation marks omitted). It was Defendant's theory of the case that Complainant had consented to his sexual acts based on evidence that she voluntarily accompanied him all day to the beach and his hotel room, even after an alleged assault, and that she did not complain to any of the other children who were present. Although this evidence is inconclusive as to the ultimate question whether Complainant consented to the conduct alleged, under *Cabrera*, the evidence was relevant to Defendant's theory that Complainant consented. Therefore, as to Counts I, II, III, and IV, the attendant circumstance of lack of legal consent was an element of the crime charged, and thus, the trial court was required to instruct the jury as to the defense of consent with respect to each of those counts. Accordingly, we reject the prosecution's argument that Defendant was not entitled to an instruction regarding the defense of consent.

### B. *The Right to a Unanimous Verdict*

The prosecution contends that the ICA erred by holding that Defendant was denied his right to a unanimous verdict because the ICA misapplied this court's holding in *Arceo*.

■ "[T]he right of an accused to a unanimous verdict in a criminal prosecution, tried before a jury in a court of this state, is guaranteed by article I, sections 5 and 14 of the Hawai'i Constitution [11]." *Arceo*, 84 Hawai'i at 30, 928 P.2d at 872. The jury must unanimously find that each material element of the offense has been proven-the conduct, the attendant circumstances, and the result of conduct-as well as the mental state requisite to each element. *See id.;* HRS §§ 702-204 (1993) and 702-205 (1993).

### 1. *State v. Arceo:* **Separate and Distinct Culpable Acts**

In *Arceo*, evidence of multiple acts of sexual contact and sexual penetration was intro-

duced to support each of two counts of sexual assault. 84 Hawai'i at 3, 928 P.2d at 845. This court held that, "when separate and distinct culpable acts are subsumed within a single count charging a sexual assault-any one of which could support a conviction thereunder-and the defendant is ultimately convicted by a jury of the charged offense, the defendant's constitutional right to a unanimous verdict is violated" unless either the prosecution elects the specific conduct upon which it intends to rely to establish the conduct element of the offense or the trial court gives the jury a specific unanimity instruction. *Id.* at 32–33, 928 P.2d at 874–75. The prosecution argues that the unanimity requirement articulated in *Arceo* does not apply to the instant case because the various grounds upon which the jury could have found a lack of consent, *i.e.*, the absence of consent or one of the four grounds for finding ineffective consent, did not amount to separate and distinct culpable acts that could support separate counts of an indictment or complaint. We agree with the prosecution.

■ As this court recognized in *Valentine*,

[t]he *Arceo* decision dealt with a situation in which the prosecution had adduced evidence regarding *independent incidents*, during each of which the defendant engaged in conduct that could constitute the offense charged, and each of which could have been, but were not, charged as separate offenses. Inasmuch as these independent instances of culpable conduct were submitted to the jury in a single count that charged but one offense, we held that a specific unanimity instruction was necessary to ensure that each juror convicted the defendant on the basis of the *same incident of culpable conduct.*

Thus, two conditions must converge before an *Arceo* unanimity instruction, absent an election by the prosecution, is neces-

---

11. Article I, section 5 of the Hawai'i Constitution provides in relevant part that "[n]o person shall be deprived of life, liberty or property without due process of law[.]" Article I, section 14 provides in relevant part that, "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial by an impartial jury[.] Juries, where the crime charged is serious, shall consist of twelve persons."

sary: (1) at trial, the prosecution adduces proof of two or more separate and distinct culpable acts; and (2) the prosecution seeks to submit to the jury that only one offense was committed. Moreover, it bears repeating that the purpose of an *Arceo* unanimity instruction is to eliminate any ambiguity that might infect the jury's deliberations respecting the particular conduct in which the defendant is accused of engaging and that allegedly constitutes the charged offense.

93 Hawai'i at 208, 998 P.2d at 488 (emphases added) (citations omitted).

In the instant case, although the prosecution adduced proof of two or more "separate and distinct culpable acts" or "independent incidents," the prosecution correctly charged Defendant with separate counts of sexual assault with respect to each distinct culpable act or incident.[12] Thus, the danger present in *Arceo* that the jury did not agree upon which independent incident constituted the charged offense was not presented by the consent instruction in this case. *See Valentine*, 93 Hawai'i at 208, 998 P.2d at 488 ("[T]here was no danger that the jury would be confused regarding the conduct of which [Defendant] was accused and that constituted the charged offense."). Rather, the problem presented by the consent instruction in this case, discussed *infra*, was that the jury was presented with alternative means of establishing a *single element* of each of the charged offenses, specifically, the lack of legal consent, where there was insufficient evidence to support one of those alternative means.

Other state courts have made a distinction between "alternative means" cases and "multiple acts" cases. The distinction has been explained as follows:

In an alternative means case, where a single offense may be committed in more than one way, there must be jury unanimity as to guilt for the single crime charged. Unanimity is not required, however, as to the means by which the crime was committed so long as substantial evidence supports each alternative means.[13] In reviewing an alternative means case, the court must determine whether a rational trier of fact could have found each means of committing the crime proved beyond a reasonable doubt.

In multiple acts cases, on the other hand, several acts are alleged and any one of them could constitute the crime charged. In these cases, the jury must be unanimous as to which act or incident constitutes the crime. To ensure jury unanimity in multiple acts cases, we require that either the State elect the particular criminal act upon which it will rely for conviction, or that the trial court instruct the jury that all of them must agree that the same underlying criminal act has been proved beyond a reasonable doubt.

*State v. Timley*, 255 Kan. 286, 875 P.2d 242, 246 (1994) (quoting *State v. Kitchen*, 110 Wash.2d 403, 756 P.2d 105, 109 (1988)) (citations and quotation marks omitted). The foregoing distinction is consistent with *Arceo*, which relied heavily on federal law, as well as cases from Washington, Alaska, Colorado, and Tennessee, in holding that unanimity is required, absent an election by the prosecution, as to each separate and distinct culpable act. *Arceo*, 84 Hawai'i at 32, 928 P.2d at 874 ("In our view, the logic of [*State v.*] *Petrich*, 101 Wash.2d 566, [683 P.2d 173, 177 (Wash. 1984), *modified by Kitchen*, 756 P.2d at 109–10], *Covington [v. State ]*, [703 P.2d 436, 440, *aff'd in part on reh'g, State v. Covington*, 711 P.2d 1183, 1185 (Alaska Ct.App.1985) (holding that, although trial court erred by failing

12. The jury was presented with the following "separate and distinct culpable acts" or "independent incidents": Count I for sexual assault in the second degree (sexual penetration in the hotel room); Count II for attempted sexual assault in the second degree (attempted sexual penetration in the pool); Count III for sexual assault in the fourth degree (exposure of genitals in the car); Count IV for sexual assault in the fourth degree (placing hand on Complainant's breast in the car); and Count V for sexual assault in the

fourth degree (placing penis on Complainant's vagina in the hotel room).

13. Jurisdictions employ varying approaches in determining whether jury unanimity is required in alternative means cases and differ as to whether substantial evidence of each alternative means is required. *See infra* sections III.B.2.a. and III.B.2.b.

to give unanimity instruction, error was not raised at trial and did not constitute plain error requiring reversal of conviction) ], [*People v.] Aldrich*, [849 P.2d 821 (Colo.Ct.App. 1992),] [*State v.] Brown*, [762 S.W.2d 135, *reh'g denied*, 762 S.W.2d 135 (Tenn.1988) ], and the line of federal decisions arising out of [*United States v. ]Echeverry* [, 719 F.2d 974 (9th Cir.1983) ] is cogent, compelling, and ineluctable."). Some of the cases relied upon by the court in *Arceo*, like *Timley*, make the distinction between alternative means cases and multiple acts cases. *See Petrich*, 683 P.2d at 177 (distinguishing case involving "several criminal acts" from "alternative means cases"); *Covington*, 703 P.2d at 439–40 (distinguishing case involving "separate criminal acts" from a case involving "different means of committing the same offense"). Indeed, each of the jurisdictions relied upon in *Arceo* employs some form of alternative means analysis. *See, e.g., Schad v. Arizona*, 501 U.S. 624, 111 S.Ct. 2491, 115 L.Ed.2d 555, *reh'g denied*, 501 U.S. 1277, 112 S.Ct. 28, 115 L.Ed.2d 1109 (1991) (adopting rational and fair approach to alternative means analysis); *Kitchen*, 756 P.2d at 109 (making distinction between alternative means cases and multiple act cases, identifying *Petrich* as a multiple acts case); *State v. James*, 698 P.2d 1161, 1165–67 (Alaska 1985) (holding that juries need not unanimously agree upon particular statutory theory of crime charged if there is sufficient evidence in record to support either theory, where jury is instructed disjunctively or on alternative methods by which defendant may commit single offense; jury need only be unanimous in its conclusion that defendant committed single offense described in statute) (cited in and distinguished by *Covington*, 703 P.2d at 439–40); *James v. People*, 727 P.2d 850, 854–55 (Colo.1986) (recognizing "the general principle that a defendant is not deprived of his right to a unanimous verdict in circumstances where the court instructs the jury that the crime can be committed in alternative ways and the jury returns a general verdict of guilty" and

holding that there must be sufficient evidence of each alternative to uphold the general verdict); *State v. Lemacks*, 996 S.W.2d 166, 169–71 (Tenn.1999) (holding that unanimity was not required as to alternative theories of establishing DUI offense and distinguishing case from "multiple criminal acts" cases such as *Brown* ).

▮ We agree with the foregoing distinction and emphasize that "separate and distinct culpable acts," or "independent incidents," each of which could support a separate count of an indictment or complaint, may not be treated as "alternative means" of proving the conduct element of an offense.[14] Each "separate and distinct culpable act" or "independent incident" that may be charged as a separate count includes the conduct, attendant circumstances, and result of conduct that may be present.

To illustrate the conceptual difference between separate and distinct culpable acts or independent incidents and the conduct element, consider the following example. A defendant is charged with committing the offense of simple trespass upon two different properties on the same day. HRS § 708–815 (1993) provides that "[a] person commits the offense of simple trespass if the person knowingly enters or remains unlawfully in or upon premises." Evidence is adduced that Defendant trespassed upon premises A (Incident A) and upon premises B (Incident B). If the prosecution has charged the defendant in a single count, then the analysis in *Arceo* applies and either the prosecution must elect which incident it is relying upon in the single count or a unanimity instruction is required. The prosecution may not treat the acts of entering premises A and B as "alternative means" of proving the conduct element of one count because they represent independent incidents. However, if the prosecution charges the defendant with separate counts as to each independent incident, then the requirements of *Arceo* are met. With re-

14. As discussed *infra*, we use the term "alternative means" to describe the legal concept of *statutory* alternatives for proving a single element of the offense charged. *See State v. Klinge*, 92 Hawai'i 577, 994 P.2d 509, *reconsideration denied*, 92 Hawai'i 577, 994 P.2d 509 (2000). The legal concept of "alternative means" is distinct from the term "multiple acts," which refers to "separate and distinct culpable acts" as discussed in *Arceo*, 84 Hawai'i at 32–33, 928 P.2d at 874–75.

spect to each individual count, the statutory alternatives of "enters" or "remains" may be treated as "alternative means" of proving the conduct element of the offense, as long as it is "rational and fair" to do so under the test set forth in *Klinge*. *See* discussion *infra*. "Alternative means" is a specific legal concept that addresses whether *statutory alternatives*, not multiple acts or incidents, may be treated as a *single element* of the crime. *See Klinge*, 92 Hawai'i at 586–89, 994 P.2d at 518–21. In an abstract sense, there may be a danger that separate and distinct culpable acts could be viewed as alternative ways of establishing the conduct element of the crime. However, this is precisely why we distinguish "multiple act" cases from "alternative means" cases. This distinction affirms the principles underlying both *Arceo* and *Klinge* and avoids the absurd result of requiring unanimity every time a criminal statute uses the word "or." *Cf. Klinge*, 92 Hawai'i at 606 n. 12, 994 P.2d at 538 n. 12 (Ramil, J., dissenting) ("It is elementary that the mere presence of the word 'or' in a statute would not, in and of itself, implicate a defendant's right to a unanimous verdict.").[15]

Because the prosecution correctly charged Defendant with separate counts of sexual assault with respect to each distinct culpable act or incident, the danger present in *Arceo*—that the jury did not agree upon which independent incident constituted the charged offense—was not presented by the consent instruction in this case. Having determined that *Arceo* does not apply to the facts of this case, we now examine this court's recent decision in *Klinge*, which recognized that unanimity may not be required where the jury is presented with alternative means of establishing a single element of the offense charged. 92 Hawai'i at 589, 994 P.2d at 521.

### 2. *State v. Klinge*: Alternative Means

In *Klinge*, the defendant (Klinge) was convicted of terroristic threatening in the first degree. 92 Hawai'i at 579, 994 P.2d at 511. HRS § 707–715 (1993) provides that a person commits the offense of terroristic threatening

if the person threatens, by word or conduct, to cause bodily injury to another person or serious damage to property of another or to commit a felony:

(1) With the intent to terrorize, or in reckless disregard of the risk of terrorizing, another person; or

(2) With intent to cause, or in reckless disregard of the risk of causing evacuation of a building, place of assembly, or facility of public transportation.

On appeal, Klinge argued that his constitutional right to a unanimous verdict was violated because the two alternative mental states upon which the jury could have convicted him of terroristic threatening gave rise to separate crimes and the trial court erred in failing to issue an instruction guaranteeing unanimity as to either "intent." *Id.* at 579–80, 994 P.2d at 511–12. Rejecting Klinge's contentions, this court held that

HRS § 707–715 defines a single criminal offense.... HRS §§ 707–715(1) and (2) constitute alternative means of establishing the mens rea of the offense of terroristic threatening—either one giving rise to the same criminal culpability. Accordingly, the trial court in [*Klinge*] did not err in its instruction to the jury.

*Id.* at 589, 994 P.2d at 521 (emphasis omitted). In *Klinge*, the determination whether unanimity was required focused on whether the two alternative mental states, provided in the statute, defined separate crimes requiring individual proof of each offense[16] or

---

**15.** We recognize that reasonable minds may disagree as to whether statutory alternatives may "rationally and fairly" be treated as "alternative means" of establishing a single element of a crime or actually define separate crimes. For example, in *Klinge*, the majority of the court believed that "intent to terrorize" and "intent to evacuate" were merely "alternative means" of establishing the mental state of the offense of terroristic threatening under HRS § 707–715 (1993). *See Klinge*, 92 Hawai'i at 589, 994 P.2d at 521 & discussion *infra*. The dissenters, on the other hand, believed that these statutory alternatives were aimed at prohibiting different results and that the language of the statute evinced a legislative intent to define separate offenses. *Id.* at 597–600; 994 P.2d at 529–32 (Ramil, J., dissenting, joined by Levinson, J.).

**16.** We note that, in certain circumstances, if statutory alternatives do indeed define separate offenses, then the court must consider whether conviction of more than one offense would be prohibited under HRS § 701–109 (1993).

merely constituted alternative means of establishing the state of mind element of a single offense. In order to determine whether jury unanimity was required as to the alternative mental states provided in the statute, this court in *Klinge*, relying on *Schad v. Arizona*, 501 U.S. 624, 111 S.Ct. 2491, 115 L.Ed.2d 555, *reh'g denied*, 501 U.S. 1277, 112 S.Ct. 28, 115 L.Ed.2d 1109 (1991), considered "whether the level of verdict spec-

ificity required by the instructions was rational and fair, considering history and practice, and the degree of 'blameworthiness and culpability.' " *Klinge*, 92 Hawai'i at 586–87, 994 P.2d at 518–19 (citation omitted).[17]

▆ The discussion in *Klinge* makes clear that the determination whether it is rational and fair to treat statutory alternatives as "alternative means" must be made on a case-by-case basis.[18] In making such

**17.** In *Schad*, the United States Supreme Court rejected the adoption of any single test or criterion for determining whether statutory alternatives could fairly be treated as alternative means or separate crimes. · The Court recognized that there was a body of federal law, derived from *United States v. Gipson*, 553 F.2d 453 (5th Cir. 1977), that employed a "distinct conceptual groupings" test [hereinafter, conceptually distinct test] to determine what constitutes an immaterial difference as to mere means and what constitutes a material difference requiring separate theories of a crime to be treated as separate crimes subject to separate jury findings. *Schad*, 501 U.S. at 633–34, 111 S.Ct. 2491. However, *Schad* rejected the *Gipson* conceptually distinct test as "too indeterminate to provide concrete guidance" and also rejected the adoption of "an inflexible rule of maximum verdict specificity." *Id.* at 635–36, 111 S.Ct. 2491. The Court reasoned as follows:

> It is tempting, of course, to follow the example of *Gipson* to the extent of searching for some single criterion that will serve to answer the question facing us. We are convinced, however, of the impracticability of trying to derive any single test for the level of definitional and verdict specificity permitted by the Constitution, and we think that instead of such a test our sense of appropriate specificity is a distillate of the concept of due process with its demands for fundamental fairness, *see, e.g., Dowling v. United States*, 493 U.S. 342, 352–353, 110 S.Ct. 668, 674, 107 L.Ed.2d 708 (1990), and for the rationality that is an essential component of that fairness. In translating these demands for fairness and rationality into concrete judgments about the adequacy of legislative determinations, we look both to history and wide practice as guides to fundamental values, as well as to narrower analytical methods of testing the moral and practical equivalence of the different mental states that may satisfy the *mens rea* element of a single offense. *The enquiry is undertaken with a threshold presumption of legislative competence to determine the appropriate relationship between means and ends in defining the elements of a crime.*

*Id.* at 638, [111 S.Ct. 2491] (emphasis added).

Following *Schad*, federal courts have further clarified the difference between "means" and "elements" by recognizing that the jury must unanimously find that each element has been proven, but the jury need not agree unanimously

on the means by which an element has been proven. *See United States v. Powell*, 226 F.3d 1181, 1196 (10th Cir.2000) (citing *Richardson v. United States*, 526 U.S. 813, 817, [119 S.Ct. 1707, 143 L.Ed.2d 985] (1999) (citing *Johnson v. Louisiana*, 406 U.S. 356, 369–71, [92 S.Ct. 1620, 32 L.Ed.2d 152] (1972) (Powell, J., concurring); *Schad*, 501 U.S. at 629, [111 S.Ct. 2491])). In this opinion, we go even further than the federal courts in the level of unanimity required by specifically distinguishing "multiple acts" cases from "alternative means" cases and ensuring that "separate and distinct culpable acts" or "independent incidents" may not be treated as alternative means of proving the conduct element of an offense. *See supra* note 13 and accompanying text.

**18.** By way of illustration, HRS § 707–711 (1993) provides in relevant part:

> **Assault in the second degree.** (1) A person commits the offense of assault in the second degree if:
> (a) The person intentionally or knowingly causes substantial bodily injury to another; [or]
> (b) The person recklessly causes serious bodily injury to another person[.]

Although subsections (a) and (b) are "statutory alternatives" for proving assault in the second degree, they could not rationally and fairly be treated as alternative means of establishing a *single element* of an offense. Rather, subsections (a) and (b) define separate offenses, each with its own "set of elements." The history and practice in this jurisdiction also demonstrate that subsections (a) and (b) have been treated as separate offenses. *See, e.g., State v. Gomes*, 93 Hawai'i 13, 15, 995 P.2d 314, 316 (2000) (indictment charged defendant with one count of assault in the second degree, in violation of subsection (a)); *State v. Kekona*, 77 Hawai'i 403, 404, 886 P.2d 740, 741 (1994) (defendant charged with assault in the second degree in violation of subsection (b)). Thus, if a defendant was charged with and evidence was adduced of a single incident of assault, the prosecution would have to elect which offense-subsection (a) or (b)-it was attempting to establish and, under HRS § 701–109, the defendant could not be convicted of both offenses for the same conduct. *See supra* note 15.

determination, we considered several factors, including, but not limited to, the language and legislative history of relevant statutes, the history and practice in Hawai'i and other jurisdictions, and whether the alternatives reflect equivalent notions of blameworthiness and culpability. *Id.* In holding that unanimity was not required as to the alternative mental states defined in the terroristic threatening statute applicable in *Klinge*, we declined to "express any opinion on the necessity of unanimity in other situations not present in this case." *Id.* at 589 n. 12, 994 P.2d at 521 n. 12. Thus, although this court recognized that unanimity may not be required where the jury is presented with alternative means of satisfying the requisite state of mind element of a single offense, we did not address in *Klinge* the issues presented here: (a) whether jury unanimity is required when the jury is presented with alternative means of establishing an element other than mental state; and (b) whether due process requires sufficient evidence of each alternative means to uphold a verdict where it is impossible to tell which alternative the jury relied upon.

### a. *alternative means of establishing lack of legal consent*

In addressing the first issue, we must determine whether the alternative theories of guilt presented to the jury regarding the lack of legal consent—(1) the absence of consent or (2) ineffective consent (based on any of the four grounds of ineffective consent)—define separate crimes or may be treated as alternative means of establishing an element of a single offense. As in *Klinge*, we examine the statutory provision, the "history and practice" in Hawai'i and other jurisdictions, and whether the alternatives "reasonably reflect notions of equivalent blameworthiness and culpability." *See Klinge*, 92 Hawai'i at 587–89, 994 P.2d at 519–21.

■ For the reasons set forth below, we hold that, based on the facts and the charged offenses in this case, the alternative theories of absence of consent and ineffective consent do not represent separate crimes; rather, they are alternative means of proving the attendant circumstance element of a single crime. Although one theory is based on the statute defining the crime and the other theory negatives a defense based on the statute prescribing when consent is not a defense, both alternatives deal with the same attendant circumstance—the lack of legal consent.

The language and history of the relevant statutory provisions support treating the absence of consent and ineffective consent as alternative means of proving the element of lack of legal consent rather than as separate crimes. HRS §§ 702–233 (1993) and 702–235 (1993), located in HRS Chapter 702 (1993), entitled "General Principles of Penal Liability," describe when consent is available as a defense. The "General Principles of Penal Liability" are applicable to all offenses. They do not create separate crimes. HRS §§ 702–233 and 702–235 are based on the Model Penal Code (MPC) § 2.11 (1962). The commentary to MPC § 2.11 makes clear that the consent provisions deal generally with the concept of consent and must be analyzed

---

However, we note that, where a defendant is charged with committing an offense under subsection (a), the statutory alternatives—"intentionally" or "knowingly"—may be treated as alternative means of establishing the requisite mental state under subsection (a).

As in *Klinge*, we emphasize that the determination whether the statutory alternatives may rationally and fairly be treated as "alternative means" must be made on a case-by-case basis. In his concurring opinion (in which Levinson, J. joins), Justice Ramil suggests that, applying the factors discussed in *Schad* and adopted in *Klinge*, this court is somehow bound to interpret the Hawai'i Penal Code, specifically HRS § 707–701(1) (1993), which defines the offense of first degree murder, in a manner inconsistent with both the intent of the Hawai'i legislature and the

Hawai'i Constitution. *See* Concurring op. at 187–88 & n. 5, 29 P.3d at 377–78 & n. 5. To the contrary, the factors to be considered under *Schad* and *Klinge* include the intent of the legislature and the consideration of what is rational and fair under the due process clause of the Hawai'i Constitution. *See* discussion *supra*. We do not necessarily disagree with Justice Ramil's interpretation of HRS § 707–701(1), which is essentially that, based on the language and the history and practice in this jurisdiction, subsections (a) through (e) of HRS § 707–701(1) define separate offenses that could not rationally and fairly be treated as alternative means of establishing an element of the crime. However, we fail to see how the application of the factors adopted in *Klinge* would require a different result.

in the context of the particular offenses to which they apply. Model Penal Code and Commentaries § 2.11, comment 1 at 394 (Official Draft and Revised Comments 1985) [hereinafter, MPC Commentaries] ("The question of whether consent can constitute a defense to a crime is best analyzed in the context of particular offenses and particular conduct."); MPC Commentaries, § 2.11, comment 3 at 398 (discussing why general provision dealing with ineffective consent lends completeness to Code, "while avoiding repetition of the same ideas in the definitions of the various offenses to which they are applicable"). Thus, because the general principles of liability, which include the ineffective consent statute, do not define discrete or separate offenses, the statutory scheme does not support treating the absence of consent and ineffective consent as elements of separate crimes.

Moreover, as previously stated, the Commentary to HRS § 702–235 provides that the ineffective consent statute "deprives the defendant of a defense based on consent in those situations where the complainant's apparent consent is meaningless." The commentary thus supports treating ineffective consent and the absence of consent as giving rise to the same criminal culpability.

Hawai'i case law further supports the conclusion that, in the context of this case, absence of consent and ineffective consent reflect equivalent notions of blameworthiness. In *State v. Oshiro*, 5 Haw.App. 404, 696 P.2d 846 (1985), the defendant, a dentist, raised the defense of consent to a charge of rape in the third degree based upon his assault upon his dental assistant while she was mentally incapacitated due to the defendant's administration of nitrous oxide. With the intent of engaging in sexual intercourse with his newly hired dental assistant, the defendant induced her to try nitrous oxide by telling her that she would be able to explain to patients what it felt like to be under nitrous oxide. At the time the offense occurred, HRS § 707–732(1) defined rape in the third degree as follows: "A male commits the offense of rape in the third degree if he intentionally engages in sexual intercourse with a female who is mentally defective, mentally incapacitated, or

physically helpless." *Oshiro*, 5 Haw.App. at 405 n. 1, 696 P.2d at 848 n. 1. The defendant argued that the trial court's finding of mental incapacitation was erroneous because his deception did not vitiate the complainant's consent to the gas. *Id.* at 407, 696 P.2d at 849–50. Rejecting the defendant's argument, the ICA reasoned as follows:

> The term "mentally incapacitated" is defined in HRS § 707–700(13) as the state of a person who is temporarily incapable of appraising or controlling his conduct due to a substance administered to him *without his consent.* Under HRS § 702–235(4) (1976)[, the ineffective consent statute,] consent will not "constitute a defense if . . . [i]t is induced by . . . deception." Defendant argues that the trial court incorrectly applied the consent statute to the mentally incapacitated statute, as the factor of consent in HRS § 707–700(13) is not a defense, but an element. Therefore, he contends, the trial court's finding that his deception negated the victim's consent is erroneous.
>
> . . . It is true that consent here is an element so HRS § 702–235(4) is not directly applicable. However, both common law and common sense impel the logical conclusion that *the denomination of consent as an element or a defense should not affect its basic nature. Extrinsic factors such as the burden of proof may change, but the essence of what constitutes consent does not.* No other term in the legal lexicon is subject to such a dichotomy. Thus, if consent as a defense is subject to the ten qualifications of HRS § 702–235, then consent as an element is similarly restricted. We therefore agree with the trial court and hold that the deception did vitiate the victim's consent.

*Id.* at 407–08, 696 P.2d at 849–50 (footnote omitted) (some emphases added and some omitted). Therefore, in practice, this jurisdiction has treated the absence of consent and ineffective consent as giving rise to the same culpability.

The history and practice in other jurisdictions also supports the conclusion that treating absence of consent and ineffective consent as alternative means of proving the

element of lack of consent is rational and fair. For example, in *State v. Ice*, 27 Kan. App.2d 1, 997 P.2d 737 (2000), the jury was presented with the following alternative theories, based on statutory alternatives, of establishing that sexual intercourse was committed without the consent of the complainant under circumstances when: (1) she was overcome by force or fear; or (2) she was physically powerless; or (3) she was incapable of giving valid consent because of mental deficiency or disease; or (4) she was incapable of giving valid consent because of the effect of alcoholic liquor.. *Id.* at 739. Although the Kansas Court of Appeals reversed the defendant's rape conviction because one of the alternative theories was not supported by sufficient evidence, *see* discussion *infra*, the court treated the alternatives as "alternative means by which the jury could have determined lack of consent" rather than as separate crimes. *Id.* Although the Kansas statute at issue in *Ice* is substantially different than the statutes at issue in this case, the Kansas court's analysis supports the conclusion that it is rational and fair to treat the alternative theories in this case as "alternative means" rather than separate crimes. *Id.; see also State v. Ortega–Martinez*, 124 Wash.2d 702, 881 P.2d 231, 234–35 (1994) (holding that jury unanimity as to alternative means of committing rape was not required where there was sufficient evidence of either alternative: (1) by forcible compulsion; or (2) with someone incapable of consent by reason of mental incapacity). *Cf. State v. Timley*, 255 Kan. 286, 875 P.2d 242, 245–46 (1994) (holding that unanimity not required where there was sufficient evidence of both of the alternative means of perpetrating sexual act presented to the jury: by the use of force or by the use of fear).

With respect to whether the statutory alternatives in this case may be treated as alternative means, it is not significant that the jury may have reached different conclusions regarding whether Complainant did not consent or any apparent consent was ineffective, *i.e.*, meaningless, because such differences do not reflect disagreement as to the specific incident charged. *Cf. Arceo*, 84 Hawai'i at 32–33, 928 P.2d at 875–75 (requiring juror agreement as to the specific criminal act committed by the defendant); *Valentine*, 93 Hawai'i at 208, 998 P.2d at 488 ("unanimity instruction was necessary [in *Arceo* ] to ensure that each juror convicted the defendant on the basis of the same incident of culpable conduct."). Although we recognize that the absence of consent and the giving of consent that is legally ineffective are mutually exclusive circumstances, such mutual exclusivity does not preclude a determination that they may be treated as alternative means in this case because the jury's verdict as to each count was based on the same incident of culpable conduct. *Cf. Rice v. State*, 311 Md. 116, 532 A.2d 1357 (1987) (where relevant statute provided, by means of different subsections, that theft could be committed by either taking the property of another or by merely possessing it with the knowledge or belief that it had been stolen, the court concluded that statutory alternatives could be treated as alternative means of committing one crime even though alternatives were mutually exclusive). The sole issue is whether Complainant legally consented. *Cf. Oshiro*, 5 Haw.App. at 408, 696 P.2d at 850 (stating that "the denomination of consent as an element or a defense should not affect its basic nature").[19]

Based on the foregoing, we hold that the absence of consent and the relevant grounds

---

**19.** In his concurring opinion (joined by Levinson, J.), Justice Ramil rejects the foregoing analysis and the application of the factors set forth in *Klinge* as the method for determining whether statutory alternatives may fairly be treated as alternative means. He states that "[t]he appropriate method by which to determine whether statutory alternatives represent separate and distinct offenses or alternative means of proving a single offense is by reference to legislative intent, and not by utilization of an amorphous due process analysis." Concurring op. at 184, 29 P.3d at 374. Justice Ramil appears to disagree with

our analysis because, in his view: (1) "[t]he question whether statutory alternatives constitute alternative means of proving a single offense is . . . a question of statutory interpretation[ ]" that does not involve a "wide-ranging due process analysis that contemplates history, fairness, widespread practice, and the moral equivalence of statutory alternatives," concurring op. at 184, 29 P.3d at 374; (2) our analysis includes a discussion of what he considers to be irrelevant authority from other jurisdictions, *id.* at 184, 29 P.3d at 374; and (3) the analysis employed by the court· in *United States v. UCO Oil Co.*, 546 F.2d 833 (9th Cir.1976), is more appropriate "for

of proving ineffective consent may be treated as alternative means of establishing that Complainant did not legally consent to the sexual conduct alleged in this case. We acknowledge that the jury should be instructed on only those grounds of ineffective consent that have a basis in the evidence. If more than one ground is relevant, they may be treated as alternative means of proving ineffective consent.

We turn next to the question whether sufficient evidence of each alternative means submitted to the jury is required to uphold the verdict.

b. *sufficient evidence of alternative means*

In this case, the jury was instructed that it could find Defendant guilty based on the absence of consent or any of the four grounds of ineffective consent, essentially giving the jury five alternative means of establishing that Complainant did not legally consent to the conduct. The ICA concluded that the consent instruction amounted to plain error based in part on the possibility that jurors may have found that Complainant consented to the conduct but that such consent was ineffective, where the prosecution did not present legally sufficient evidence of ineffective consent. In its application for a writ of certiorari, the prosecution contends that, although the ineffective consent instruction was erroneously given, it was "so inapplicable" that it could not have contributed to the verdict.

It is undisputed that there was legally sufficient evidence to support a jury finding

determining whether statutory alternatives constitute alternative means or separate offenses[.]" Concurring op. at 188, 29 P.3d at 378.

As discussed above, in determining whether jury unanimity is required as to statutory alternatives, we look at the language of the statute at issue and the intent of the legislature to determine whether the legislature intended to define separate offenses or merely define alternative means of establishing an element of the offense. However, we must also consider whether a particular statutory interpretation is consistent with constitutional principles of due process. *See supra* note 11 & accompanying text (citing *Arceo*, 84 Hawai'i at 30, 928 P.2d at 872) (the right of an accused to a unanimous verdict in a criminal prosecution is guaranteed, in part, by the due process clause of the Hawai'i Constitution)). Although we recognize that "fairness" can be a somewhat "amorphous" concept, fairness is the underlying principle of the due process clause. *See, e.g., Arceo*, 84 Hawai'i at 30, 928 P.2d at 872 (discussing the right to a fair trial as a guarantee of the due process clause); *State v. Timoteo*, 87 Hawai'i 108, 126, 952 P.2d 865, 883 (1997) (discussing the "quantum fairness to which [a defendant] is entitled under principles of due process" (citations omitted)). Moreover, it is useful to consider the history and practice in other jurisdictions when determining what the minimum standards of fairness should be under the Hawai'i Constitution.

Despite Justice Ramil's staunch criticism of the analysis discussed herein and the application of the factors set forth in *Klinge*, we fail to see any significant difference in the analysis proposed in his concurring opinion. In order to determine whether statutory alternatives can rationally and fairly be treated as alternative means of proving an element of an offense, we consider the language and legislative history of the relevant stat-

utory provisions, the history and practice in Hawai'i and other jurisdictions, and whether the statutory alternatives reflect equivalent notions of culpability. Justice Ramil would apply the following factors instead: "(1) the language of the statute; (2) the legislative history; (3) the nature of the proscribed conduct; and (4) the appropriateness of multiple punishment for the conduct engaged in the indictment." Concurring op. at 188, 29 P.3d at 378 (citing *UCO Oil*, 546 F.2d 833, 836–37). However, the factors proposed by Justice Ramil are not materially inconsistent with this opinion or the opinion in *Klinge*. *Cf. UCO Oil*, 546 F.2d at 835–36 (discussing factors in the context of protecting the "fundamental due process rights of defendants"); *Klinge*, 92 Hawai'i at 587 n. 5, 994 P.2d at 519 n. 5 (citing *UCO Oil* as one of various approaches); *Schad*, 501 U.S. at 663, [111 S.Ct. 2491] (citing *UCO Oil* for the proposition that "the requisite specificity of the charge may not be compromised by the joining of separate offenses"). In fact, applying the factors set forth in *UCO Oil*, Justice Ramil adopts much of our analysis and reaches the same conclusion. *See* Concurring op. at 188–89, 29 P.3d at 378–79. For example, in discussing the "nature of the proscribed conduct" and the "appropriateness of multiple punishment," Justice Ramil is essentially considering the relative culpability and blameworthiness of the statutory alternatives and whether it is rational and fair (or appropriate) to treat the alternatives as separate crimes.

We recognize that, in considering whether statutory alternatives may be treated as "alternative means," other jurisdictions describe the relevant inquiry in various ways. *See supra* note 15. *See also Klinge*, 92 Hawai'i at 587 n. 5, 994 P.2d at 519 n. 5. In *Klinge*, this court, having considered the factors discussed in *UCO Oil*, decided to adopt the factors set forth in *Schad* instead. *Id.* We see no reason to reverse that decision today.

of absence of consent. The prosecution also conceded that, although there was *some* evidence to support a finding of ineffective consent based on two of the four statutory grounds,[20] the evidence adduced in support of those grounds was legally insufficient. Thus, the issue before this court is whether the ineffective consent instruction constituted reversible error where it is possible that the jury found Defendant guilty based upon one of the grounds of ineffective consent, despite the prosecution's failure to meet its burden of proof as to that ground. In other words, in an alternative means case where it is impossible to tell which alternative the jury's verdict is based upon, does due process require that each of the alternative means presented to the jury be supported by legally sufficient evidence?

In *Griffin v. United States,* 502 U.S. 46, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991), the United States Supreme Court addressed whether, in an alternative means case where the jury was not instructed to reach unanimity on one of the alternatives, legally sufficient evidence of each alternative submitted to the jury is required to comply with due process. In *Griffin,* the defendant was charged with a single count of conspiring to defraud an agency of the federal government,[21] and the conspiracy was alleged to have had two objects: (1) impairing the efforts of the Internal Revenue Service to ascertain income tax liability; and (2) impairing the efforts of the Drug Enforcement Agency (DEA) to identify forfeitable assets. *Id.* at 47, 112 S.Ct. 466. The two objects were treated as alternative means of establishing the offense.[22] At trial, the government failed to produce any evidence to prove interference with the DEA. *Id.* at 48, 112 S.Ct. 466.

The jury returned a general verdict of guilt against Griffin and her two codefendants. *Id.* The Court held that the due process clause of the fifth amendment to the federal constitution does not require that a general guilty verdict in a multiple object conspiracy case be set aside where the verdict left in doubt whether the jury had convicted the defendant of the first or second object, regardless whether the evidence is insufficient to support a conviction as to one of the objects. *See id.* at 56–60, 112 S.Ct. 466.

In affirming the defendant's conviction, the Court relied primarily on its holding in *Turner v. United States,* 396 U.S. 398, 90 S.Ct. 642, 24 L.Ed.2d 610 (1970). *See Griffin,* 502 U.S. at 56–57, 112 S.Ct. 466. As discussed by the Court in *Griffin, Turner*

> involved a claim that the evidence was insufficient to support a general guilty verdict under a one-count indictment charging the defendant with knowingly purchasing, possessing, dispensing, and distributing heroin not in or from the original stamped package, in violation of 26 U.S.C. § 4704(a)(1964 ed.). [The Court in *Turner*] held that the conviction would have to be sustained if there was sufficient evidence of distribution *alone.* [*Turner*] set forth as the prevailing rule: "[W]hen a jury returns a guilty verdict on an indictment charging several acts in the conjunctive, as Turner's indictment did, the verdict stands if the evidence is sufficient with respect to any one of the acts charged." [*Turner,* 396 U.S.] at 420, [90 S.Ct. 642][.]

*Griffin,* 502 U.S. at 56–57, 112 S.Ct. 466 (emphasis in original). The Court in *Griffin* concluded that, where one of the possible bases of conviction was neither unconstitu-

---

**20.** The prosecution, in its opening brief, argued that, although subsections (1) and (3) of the ineffective consent statute were inapplicable because there was no evidence adduced in support thereof, "there was evidence adduced in support of both subsections (2) and (4) [of the ineffective consent statute]."

**21.** The defendants were charged under 18 U.S.C. § 371, which provided in pertinent part that, "[i]f two or more persons conspire ... to ...

defraud the United States[ ] or any agency thereof in any manner for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be [guilty of a crime.]" *Griffin,* 502 U.S. at 47, 112 S.Ct. 466.

**22.** We express no opinion as to whether, under facts similar to *Griffin,* these alternative objects of the conspiracy would be treated as alternative means of establishing an element of a single offense under Hawai'i law.

tional [23] nor illegal,[24] but "merely" unsupported by sufficient evidence, there was no violation of the due process clause. *Id.* at 59–60, 112 S.Ct. 466. The Court made a distinction between a jury instruction that misstates the law and one that presents a theory of conviction not supported by the evidence, reasoning that, although jurors are generally not equipped to discern a mistake in the law as charged to them, the Court may be more confident that the jury would reject a legal theory not supported by the facts. *Id.* at 59, 112 S.Ct. 466.

> The petitioner in *Griffin* sought
> to distinguish *Turner* on the basis that it applies only where one can be *sure* that the jury did not use the inadequately supported ground as the basis of the conviction. That assurance exists, petitioner claim[ed], when the prosecution presents *no evidence whatever* to support the insufficient theory; if the prosecution offers *some,* but insufficient, evidence on the point, as it did in [*Griffin* ],

then the verdict must be set aside because it is impossible to determine the theory upon which the jury relied. *Id.* at 58, 112 S.Ct. 466 (emphases in original). The Court rejected a rule, advanced by the petitioner, that distinguished situations where there was absolutely *no* evidence in support of a theory from situations where there was *some* evidence, although insufficient. *Id.* The Court reasoned that such a rule would reward the greater failure of proof, was full of practical difficulty, and was not supported by *Turner.* *Id.* The Court recognized, however, that "it would generally be preferable" for the trial court to remove unsupported theories from the jury's consideration. *Id.* at 60, 112 S.Ct. 466.[25]

**23.** In *Griffin,* the Court distinguished its holding in *Stromberg v. California,* 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (1931), which stands for the proposition that, "where a provision of the Constitution forbids conviction on a particular ground, the constitutional guarantee is violated by a general verdict that may have rested on that ground." *Griffin,* 502 U.S. at 53, 112 S.Ct. 466.

**24.** The Court in *Griffin* also distinguished its holding in *Yates v. United States,* 354 U.S. 298, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957), wherein the Court held that the verdict must be set aside where the verdict is supportable on one ground,

Although *Griffin* established that, under federal law, sufficient evidence was required for only one of the alternative means supporting a conviction, a number of state courts have rejected such analysis on state law grounds, holding that there must be sufficient evidence to support each alternative theory submitted to the jury to uphold a general verdict of guilty. *See e.g., Commonwealth v. Plunkett,* 422 Mass. 634, 664 N.E.2d 833, 837 (1996) (rejecting *Griffin* on state law grounds); *Ortega–Martinez,* 881 P.2d at 234–35 (rejecting *Griffin* on state law grounds); *People v. Rodriguez,* 914 P.2d 230, 273 (Colo.1996) (citing *James v. People,* 727 P.2d 850 (Colo.1986) (rejecting *Turner* on state law grounds)); *see also Bloomquist v. State,* 914 P.2d 812 (Wyo.1996) (upholding general verdict in alternative means case based on state law that requires legally sufficient evidence of each alternative ground for conviction); *Timley,* 875 P.2d at 246 (citing *Kitchen,* 756 P.2d at 109, for the proposition that unanimity is not required in an alternative means case provided that substantial evidence supports each alternative · means); *cf. Ice,* 997 P.2d at 741 (distinguishing *Griffin,* where there was strong evidence supporting one theory and none on another, from case where evidence of alternative theory was legally insufficient despite significant testimony and prosecutorial effort). *But see, e.g., Atwater v. State,* 626 So.2d 1325, 1327–28 n. 1 (Fla.1993) (adopting *Griffin* with approval), *cert. denied,* 511 U.S. 1046, 114 S.Ct. 1578, 128 L.Ed.2d 221 (1994); *Guiton,* 17 Cal.Rptr.2d 365, 847 P.2d at 53 (harmonizing *Griffin* rule with state law, holding that, on appeal of a conviction by a jury that was presented with alternate legal theories of conviction, one of which is factually inade-

but the other alternative ground for the verdict was barred by the relevant statute of limitations and it is impossible to tell which ground the jury selected. *Griffin,* 502 U.S. at 53, 112 S.Ct. 466.

**25.** In a concurring opinion, Justice Blackmun further noted that "the Government had two other means of avoiding the possibility, however remote, that petitioner was convicted on a theory for which there was insufficient evidence: The Government either could have charged the two objectives in separate counts, or agreed to petitioner's request for special Ointerrogatories." *Griffin,* 502 U.S. at 60, 112 S.Ct. 466 (Blackmun, J. concurring).

quate, the appellate court should affirm the judgment unless a review of the entire record affirmatively demonstrates a reasonable *probability* that the jury in fact found the defendant guilty *solely* on the unsupported theory); *State v. Enyeart*, 123 Idaho 452, 849 P.2d 125, 128–29 (1993) (citing *Griffin* for the proposition that a general verdict stands even if one of the alternative bases for conviction was not supported by sufficient evidence).

In *Plunkett*, the Massachusetts Supreme Judicial Court held that a new trial on the charge of murder was required where the jury was presented with two alternative theories of first degree murder, there was insufficient evidence as to one of the theories, and it was impossible to tell upon which theory the jury relied. Rejecting the United States Supreme Court's analysis in *Griffin*, the Massachusetts court stated:

> We do not accept the Supreme Court's premise that, in such a situation, the jurors will have obviously rejected the theory for which there was no evidentiary support. If the judge tells a jury that they may find the defendant guilty on a theory that is factually unsupported (in effect committing an error of law), the jurors understandably might believe that there must be some evidence to support that theory. The law of homicide is not uncomplicated in this Commonwealth. If judges at all levels have difficulty with it from time to time, it is obvious that lay jurors can easily be confused. The premise of the Supreme Court's position, that obviously the jury did the right thing, is not so well founded as to attract our acceptance of it. *See People v. Guiton*, 4 Cal.4th 1116, 1132–33, 17 Cal.Rptr.2d 365, 847 P.2d 45 (1993) (Mosk, J., concurring) ("the premise of jury 'infallibility' is unsupported"). *If the premise of the Supreme Court's position were correct, a jury would never return a guilty verdict when the evidence was insufficient to warrant that verdict, and we know that is not so.* If a person is to be

incarcerated, . . . in fairness there must be evidentiary support for each theory of guilt on which the judge tells the jury they may find the defendant guilty.

*Plunkett*, 664 N.E.2d at 837 (emphasis added).[26] Indeed, there are numerous examples of cases in Hawai'i where this court has reversed a defendant's conviction because the jury's verdict was not supported by legally sufficient evidence as a matter of law. *See, e.g., State v. Balanza*, 93 Hawai'i 279, 288, 1 P.3d 281, 290 (2000); *State v. Bautista*, 86 Hawai'i 207, 214, 948 P.2d 1048, 1055 (1997); *State v. Malufau*, 80 Hawai'i 126, 133, 906 P.2d 612, 619, *vacated in part on other grounds*, 80 Hawai'i 126, 906 P.2d 612 (1995); *State v. Lucks*, 56 Haw. 129, 132, 531 P.2d 855, 858 (1975).

In *Ice*, the Kansas Court of Appeals reversed the defendant's rape conviction where one of the alternative theories of guilt presented to the jury was not supported by sufficient evidence. 997 P.2d at 741. The jury was presented with alternative theories of establishing that sexual intercourse was committed without the consent of the complainant, including: (1) that she was overcome by force or fear; or (2) that she was incapable of giving valid consent. *Id.* at 739. The court held that there was legally insufficient evidence of incapacity and that there was a real possibility that one or more of the jurors convicted the defendant based on that theory. *Id.* at 741. In reversing the defendant's conviction, the court in *Ice* distinguished *Griffin* as a case where "one can reasonably assume the jury did not behave capriciously and convict on a theory in which there was no evidence, when there was strong evidence supporting another theory." *Id.* The court in *Ice* reasoned that, "[w]ith so much testimony and prosecutorial effort invested into the 'no capacity' theory, we cannot say there is no real possibility that the verdict here was based only on the force [or] fear theory." *Id.* Thus, the Kansas court adopted a rule, rejected by *Griffin*, recogniz-

---

**26.** The court in *Plunkett* also noted that "[t]his problem should not be a continuing one because we have indicated today that, in cases involving more than one theory on which the defendant may be found guilty of a crime, separate verdicts on each theory should be obtained." 206 Ill. Dec. 67, 644 N.E.2d at 837 (citing *Commonwealth v. Accetta*, 422 Mass. 642, 664 N.E.2d 830 (1996)).

ing that courts could reasonably assume that · a jury would reject a theory where there was *no* evidence or argument, but that courts could not reasonably assume that a jury would not convict on a theory supported by argument and *some* evidence, although legally insufficient.

A defendant's rights are clearly prejudiced where the jury is instructed that it may find him guilty based upon a theory of guilt that is not supported by sufficient evidence as a matter of law. The source of a defendant's right to the establishment of proof beyond· a reasonable doubt in a criminal case is found in the due process clause of article I, section 5 of the Hawai'i State Constitution, independent of the United States Constitution. *State v. Perez,* 90 Hawai'i 113, 129, 976 P.2d 427, 443 (App.1998), *rev'd in part on other grounds,* 90 Hawai'i 65, 976 P.2d 379 (1999). In *Turner* and *Griffin,* the Court held that, where a jury is presented with alternative means of establishing a crime and only one is supported by sufficient evidence, the federal constitution does not require proof beyond a reasonable doubt of each alternative theory. *Turner,* 396 U.S. at 420, 90 S.Ct. 642; *Griffin,* 502 U.S. at 56–57, 112 S.Ct. 466. How-. ever, this court has recognized that the due process protection under the Hawai'i constitution is not necessarily limited to that provided by the United States Constitution. *State v. Bernades,* 71 Haw. 485, 487, 795 P.2d 842, 843 (1990) (citing *State v. Santiago,* 53 Haw. 254, 492 P.2d 657 (1971)).

We are not convinced by the reasoning of the Supreme Court in *Griffin* that the jury will necessarily reject a theory unsupported by legally sufficient evidence, particularly where there is some evidence adduced and considerable argument presented to the jury. However, we recognize, as did the Kansas Court of Appeals, that, where there is no real possibility that the jury convicted based on an unsupported theory, *e.g.,* where there is overwhelming evidence of one theory and absolutely no argument or evidence presented on another, there may be no reversible error. *See Ice,* 997 P.2d at 741; *see also State v. Chapman,* 229 Conn. 529, 643 A.2d 1213, 1221–22 (1994) (in an alternative means case, the court held that, although the trial court erroneously instructed jury on an alternative for which there was no evidence, the instruction was harmless error).

Thus, based on our analysis of Defendant's rights to a unanimous verdict and to due process under article I of the Hawai'i Constitution, we hold that unanimity is not required where alternative means of establishing an element of an offense are submitted to the jury, *provided that* there is no reasonable possibility that the jury's verdict was based on an alternative unsupported by sufficient evidence. We further hold that: (1) "separate and distinct culpable acts" may not be treated as "alternative means" of proving the conduct element of an offense, *see* section III.B.1.; and (2) whether the alternative theories may be treated as "alternative means" or constitute separate crimes is an initial determination to be made on a case-by-case basis. *See* Section III.B.2.a. Having determined that the absence of consent and ineffective consent may be treated as alternative means of proving the lack of legal consent, we now examine whether there was legally sufficient evidence of each alternative submitted to the jury in this case.

### 3. Sufficiency of the evidence in this case

When reviewing the sufficiency of the evidence presented at trial, we have repeatedly stated that

> evidence adduced in the trial court must be considered in the strongest light for the prosecution when the appellate court passes on the legal sufficiency of such evidence to support a conviction; the same standard applies whether the case was before a judge or jury. The test on appeal is not whether guilt is established beyond a reasonable doubt, but whether there was .substantial evidence to support the conclusion of the trier of fact.

*State v. Quitog,* 85 Hawai'i 128, 145, 938 P.2d 559, 576 (1997) (quoting *State v. Eastman,* 81 Hawai'i 131, 135, 913 P.2d 57, 61 (1996)) (emphasis omitted). " 'Substantial evidence' as to every material element of the offense charged is credible evidence which is of sufficient quality and probative value to enable a person of reasonable

caution to support a conclusion." *Eastman*, 81 Hawai'i at 135, 913 P.2d at 61. *State v. Birdsall*, 88 Hawai'i 1, 8, 960 P.2d 729, 736, *reconsideration denied*, 88 Hawai'i 1, 960 P.2d 729 (1998).

Here, the jury was presented with the following alternative means of establishing a lack of consent: (1) the absence of consent; or (2) ineffective consent, based on any of four grounds. It is undisputed that there was legally sufficient evidence to support the jury's consideration of the absence of consent alternative. As to the jury instruction regarding the ineffective consent alternative, the prosecution concedes that the evidence presented at trial "simply [did] not support an ineffective consent instruction in this case[,]" but argues that the instruction was so inapplicable that there is no real possibility that the erroneous instruction contributed to the verdict. Our review of the record reveals that, although there was no argument presented or evidence adduced in support of grounds one and three of the ineffective consent statute,[27] the prosecution presented considerable argument and adduced *some* evidence in support of the theory that, even if Complainant gave apparent consent, it was ineffective based on either ground two or ground four.

■ Under ground two, consent is ineffective if "[i]t was given by a person who by reason of *youth, mental disease, disorder or defect . . . is manifestly unable or known by the defendant to be unable to make a reasonable judgment as to the nature of harmfulness of the conduct alleged* [.]" (Emphasis added.) Proof of the complainant's youth alone does not satisfy the elements of Ground two. Ground two of the ineffective consent statute is thus distinguishable from the strict liability offense described in HRS § 707–732(1)(b), wherein the offense is described as sexual contact with a person less than fourteen years old. *See supra* note 5; *cf. State*

*v. Buch*, 83 Hawai'i 308, 316 n. 5, 926 P.2d 599, 607 n. 5 (1996) (noting that "[t]he Commentary to HRS § 702–235, . . . to the extent that it suggests that the Code eliminates absolute liability with respect to the victim's age in a sex offense, is directly contrary to the unequivocally expressed legislative intent [in imposing strict liability under 707–732(1)(b) ]"). In order to prove Ground two, the prosecution must prove that Defendant knew or should have known, *i.e.*, that it was "manifest," that Complainant was unable to exercise reasonable judgment as to the nature of the harmfulness of the conduct alleged. HRS § 702–235(2).

During trial, the prosecution spent considerable time focusing on Complainant's youth to explain why she did not ask to go home and chose to stay in the hotel room with Defendant, even after the earlier assaults, distinguishing Complainant's actions from an "adult response." The prosecution's arguments also repeatedly referred to the effect of Defendant's "mental manipulation" and mental coercion upon Complainant as a young girl who was easily *influenced*.[28] There was evidence that Complainant was fourteen-years-old. She also testified that "nothing like this had happened to her before," that she was embarrassed by Defendant's sexual advances, and that, when Defendant made these advances, she tried to avoid him or push him away. However, even if Complainant was inexperienced or embarrassed, there was no evidence adduced that Defendant knew or should have known that Complainant was unable to make a reasonable judgment as to the nature or the harmfulness of the conduct alleged. Thus, although there was considerable argument regarding Complainant's youth and *some* evidence of her inexperience, there was legally insufficient evidence to establish ineffective consent under Ground two.

---

27. HRS § 702–235 provides that consent is *not* a defense if "(1) [i]t is given by a person who is legally incompetent to authorize the conduct alleged [Ground 1]; or . . . (3)[i]t is given by a person whose improvident consent is sought to be prevented by the law defining the offense [Ground 3][.]"

28. The prosecution stated that "[i]t was an interesting comment [a previously excused juror] made on mental coercion being involved in cases, how it can show lack of consent. This is such a case. . . . The best way I could analogize this is the situation of the Pied Piper."

Under Ground four, consent is ineffective if, *inter alia*, "[i]t is induced by . . . *deception*." (Emphasis added.) The prosecution repeatedly referred to Defendant's use of deception and manipulation to lure this young girl to spend time with him and come to his hotel, referring to Defendant as a "pied piper" and a con artist.[29] The record contains evidence that Defendant talked about his "connection" to rock groups and modeling agencies. However, there is no evidence that Defendant was untruthful about his "connections." Defendant began his relationship with the Complainant, her family, and her friends by procuring concert tickets for them. At best, the evidence supports an inference that Defendant used his connections and procured concert tickets in order to attract Complainant to spend time with him. If the jury believed that she consented to the sexual conduct, there was no evidence that the consent to the *sexual conduct* was induced by deception that would render such consent meaningless. Thus, although there was significant prosecutorial effort expended on Defendant's use of deception and a trace of evidence that he tried to impress the Complainant with his connections, such evidence was legally insufficient to establish ineffective consent based on Ground four.

Based on the foregoing, if the jury believed that Complainant consented to the sexual conduct, Defendant should have been acquitted because there was no legally sufficient evidence in support of any of the four grounds of ineffective consent. However, the jury was instructed that they could find Defendant guilty, even if they believed Complainant consented, based upon ineffective consent. Because there was considerable argument and some evidence presented to the jury regarding the Complainant's youth and Defendant's mental manipulation and decep-

tion, it is possible that some or all of the jurors believed they could find guilt based on ineffective consent, despite the lack of legally sufficient evidence as to any of the ineffective consent grounds. *See Ice*, 997 P.2d at 741 (stating that, "[w]ith so much testimony and prosecutorial effort invested into [legally insufficient] theory, we cannot say there is no real possibility that the verdict here was based only on the [legally sufficient] theory."). Further, as recognized by the Massachusetts Supreme Judicial Court, "[i]f the judge tells a jury that they may find the defendant guilty on a theory that is factually unsupported (in effect committing an error of law), the jurors understandably might believe that there must be some evidence to support that theory." *Plunkett*, 664 N.E.2d at 837. We cannot assume that the jurors rejected the ineffective consent theories presented to them. Therefore, we hold that the instruction as to ineffective consent prejudicially affected Defendant's right to due process because (1) the jury was instructed that it could convict Defendant based on the absence of consent *or* any of the four grounds of ineffective consent, (2) there was a reasonable possibility that the verdict was based upon at least one of the four grounds of ineffective consent, and (3) there was legally insufficient evidence to support any of the four grounds of ineffective consent presented to the jury. In other words, the erroneous jury instruction regarding ineffective consent was not harmless because there was a reasonable possibility that the verdict was based on an alternative that was unsupported by legally sufficient evidence.

## IV. CONCLUSION

Based on the foregoing, we vacate Defendant's convictions on Counts I, II, III, and IV and remand this case to the circuit court for a new trial on those counts.[30] Subject to

---

**29.** The court overruled Defendant's objection to the prosecution's use of the term "con artist." Defendant argued that there was no evidence that he was a con artist.

**30.** We note that our disposition in this case does not implicate the double jeopardy clause of article I, section 10 of the Hawai'i Constitution. The double jeopardy clause bars retrial of a defendant once a reviewing court has found the evi-

dence at trial to be legally insufficient to support a conviction. *See State v. Malufau*, 80 Hawai'i 126, 135, 906 P.2d 612, 621, *opinion amended on reconsideration*, 80 Hawai'i 126, 134, 906 P.2d 612, 620 (1995). However, retrial is not barred when the reviewing court reverses a case due to trial error, such as erroneous jury instructions. *See State v. Hamala*, 73 Haw. 289, 293, 834 P.2d 275, 277 (1992), *overruled on other grounds, State v. Rogan*, 91 Hawai'i 405, 423 n. 10, 984 P.2d

the foregoing clarifications of the ICA's analysis regarding the trial court's ineffective consent instruction and the right to a unanimous verdict, we affirm the ICA's opinion.

Concurring Opinion by RAMIL, J., with whom LEVINSON, J., Joins

The appropriate method by which to determine whether statutory alternatives represent separate and distinct offenses or alternative means of proving a single offense is by reference to legislative intent, and not by utilization of an amorphous due process analysis. Accordingly, while I concur with the majority's conclusion that the defendant's conviction must be vacated because there is a reasonable possibility that the verdict in this case was based upon a statutory alternative unsupported by legally sufficient evidence, I do not join section III.B.2.a of the opinion. I write separately to explain my disagreement with the majority's analysis.[1]

As explained by a plurality of the Supreme Court of the United States:

Decisions about what facts are material and what are immaterial, or ... what facts are necessary to constitute the crime, and therefore must be proved individually, and what facts are mere means, represent value choices more appropriately made in the first instance by a legislature than by a court.

*Schad v. Arizona*, 501 U.S. 624, 638, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991) (quotation signals, brackets, and internal citation omitted). The question whether statutory alternatives constitute alternative means of proving a single offense is therefore a question of statutory interpretation. *Id.* at 636, 111 S.Ct. 2491 (citing *United States v. UCO Oil Co.*, 546 F.2d 833, 835–838 (9th Cir.1976)). This court has long recognized that its "primary duty" in interpreting a statute is to "ascertain the intention of the legislature and to implement that intention to the fullest degree[.]" *Kaiama v. Aguilar,* 67 Haw. 549, 554, 696 P.2d 839, 842 (1985).

The analysis employed by the majority is simply inapposite to a determination of the very issue the majority seeks to resolve. A wide-ranging due process analysis that contemplates history, fairness, widespread practice, and the moral equivalence of statutory alternatives is, for the most part, irrelevant to the issue of legislative intent. I fail to see, for example, how Kansas law is of any assistance to this court in ascertaining and effectuating the intent of the Hawai'i legislature.

## I. The majority's utilization of the analysis set forth in *Schad* is misplaced

In *Schad*, the United States Supreme Court considered whether it was constitutionally permissible for the state of Arizona to treat premeditated murder and felony murder as alternative means by which to prove the offense of first degree murder. Rejecting Schad's contention that these statutory alternatives constituted separate offenses, the Arizona Supreme Court relied upon its holding in a prior decision, which in turn relied upon *State v. Axley*, 132 Ariz. 383, 646 P.2d 268 (1982).[2] In *Axley*, the Arizona

---

1231, 1249 n. 10 (1999). Although our holding in this case is based, in part, on our conclusion that the jury instruction regarding ineffective consent raised the possibility that the verdict was based on an alternative means of establishing guilt not supported by legally sufficient evidence, it is undisputed that there was legally sufficient evidence of the other alternative of establishing guilt and, thus, the error in this case is trial error. Accordingly, the double jeopardy clause does not bar retrial on the means of establishing guilt for which there was sufficient evidence presented at trial.

**1.** I also note several technical inaccuracies in the majority opinion. The majority refers to *Klinge* as having "recognized that unanimity may not be required where the jury is presented with alternative means of establishing a single *element* of

the offense charged." Opinion at 172, 29 P.3d at 362 (emphasis added). *See also* Opinion at 174, 29 P.3d at 364 (again referring to mental state as an element of a crime). However, *Klinge* dealt with alternative means of proving the requisite mental state of the offense of terroristic threatening. *See* 92 Hawai'i at 586, 994 P.2d at 518. Mental state is not an *element* of an offense, *see* HRS § 701–205 (1993), but rather an independent fact that the prosecution must prove with respect to each material element of the offense. HRS § 701–114(1) (1993).

**2.** Specifically, the Arizona Supreme Court cited to *State v. Encinas*, 132 Ariz. 493, 647 P.2d 624 (1982), which in turn cited to *Axley*, for the proposition that "[i]n Arizona, first degree murder is only one crime regardless whether it occurs as a premeditated murder or a felony mur-

Supreme Court, looking solely to the text of Arizona's first degree murder statute, held that the statutory alternatives were alternative means of proving a single offense.[3] *Axley*, 646 P.2d at 277. The Court reasoned that "[a]lthough the ... indictment set forth the two bases delineated in [Ariz.Rev.Stat. § ] 13–1105 for classifying appellant's actions as first degree murder, it charged him with only one crime."[4] *Id.*

I emphasize that although Arizona's practice of treating premeditated murder and felony murder as alternative means of proving first degree murder has "substantial historical and contemporary echoes[,]" *Schad*, 501 U.S. at 640, 111 S.Ct. 2491; *see also State v. Serna*, 69 Ariz. 181, 211 P.2d 455, 459 (1949), the Arizona Supreme Court's resolution of the issue in *Axley* turned entirely on statutory interpretation. Noticeably absent from its analysis, and in stark contrast to the analysis employed by the majority of this court, is a survey of case law from other jurisdictions, or any discussion about history or degrees of blameworthiness and culpability. In my view, the *Axley* court quite properly limited its analysis to the statute's plain language because issues such as moral equivalence, blameworthiness, and culpability represent value choices more appropriately left to the legislature. *See Schad*, 501 U.S. at 638, 111 S.Ct. 2491.

The issue in *Schad* was whether Arizona law in this respect was consistent with the Due Process Clause of the United States Constitution. *Schad*, 501 U.S. at 631, 111 S.Ct. 2491; *see also Richardson v. United States*, 526 U.S. 813, 820, 119 S.Ct. 1707, 143 L.Ed.2d 985 (1999) (citing *Schad* for the proposition that "the Constitution itself limits a State's power to define crimes in ways that would permit juries to convict while disagreeing about means, at least where that definition risks serious unfairness and lacks support in history or tradition."). The Court did *not*, as the majority suggests, set forth any "test" or standard to be utilized in determining whether statutory alternatives delineate separate offenses or alternative means of proving a single offense. Rather, the plurality in *Schad* expressly deferred to Arizona's decision that premeditated murder and felony murder were not separate offenses. 501

der." *See State v. Schad*, 163 Ariz. 411, 788 P.2d 1162, 1168 (1989).

**3.** The court in *Axley*, employed the following analysis:

[Ariz.Rev.Stat. § ] 13–1105 provides that the crime of first degree murder can be committed in either of two ways. First, an individual commits first degree murder if he causes the death of another with premeditation, intending or knowing that his conduct will cause death. Second, under the doctrine of felony-murder, a person commits first degree murder if "(a)cting either alone or with one or more other persons such person commits or attempts to commit ... robbery ... and in the course of and in furtherance of such offense or immediate flight from such offense, such person or another person causes the death of any person." [Ariz.Rev.Stat. § ] 13–1105(A)(2). Although the first count of the indictment set forth the two bases delineated in [Ariz.Rev. Stat. § ] 13–1105 for classifying appellant's actions as first degree murder, it charged him with only one crime. Thus, the indictment was not duplicitous.

*Axley*, 646 P.2d at 277.

The version of Arizona's first degree murder statute at issue in *Axley*, codified at Ariz.Rev.Stat. 13–1105, was actually an amended version of the statute at issue in *Schad*. Under both versions, however, premeditated murder and murder committed in the course of a robbery constitute first degree murder. The version of the statute at issue in *Schad* read as follows:

A murder which is perpetrated by means of poison or lying in wait, torture or by any other kind of wilful, deliberate or premeditated killing, or which is committed in avoiding or preventing lawful arrest or affecting an escape from legal custody, or in the perpetration of, or attempt to perpetrate, arson, rape in the first degree, robbery, burglary, kidnapping, or mayhem, or sexual molestation of a child under the age of thirteen years, is murder in the first degree. All other kinds of murder are of the second degree.

Ariz.Rev.Stat. § 13–452 (Supp.1973).

**4.** Although not mentioned by the Arizona Supreme Court in *Axley*, a plurality of the United States Supreme Court subsequently noted that "Arizona's equation of the mental states of premeditated murder and felony murder as species of the blameworthy state of mind required to prove a single offense of first-degree murder finds substantial historical and contemporary echoes." *Schad*, 501 U.S. at 640, 111 S.Ct. 2491. As Justice Scalia observed, the crime for which Schad was convicted "has existed in the Anglo–American legal system, largely unchanged, since at least the early 16th century[.]" *Schad*, 501 U.S. at 648, 111 S.Ct. 2491 (Scalia, J., concurring) (citation omitted).

U.S. at 636, 111 S.Ct. 2491 ("If a State's courts have determined that certain statutory alternatives are mere means of committing a single offense, rather than independent elements of the crime, we simply are not at liberty to ignore that determination and conclude that the alternatives are, in fact, independent elements under state law."); *see also State v. Correa*, 241 Conn. 322, 696 A.2d 944, 957 (1997) ("In *Schad*, the United States Supreme Court deferred to the states' determination that certain statutory alternatives are mere means of committing a single offense."). The plurality in *Schad* explained:

> In the present case ... by determining that a general verdict as to first-degree murder is permissible under Arizona law, the Arizona Supreme Court has effectively decided that, under state law, premeditation and the commission of a felony are not independent elements of the crime, but rather are mere means of satisfying a single mens rea element. The issue in this case therefore is not whether "the State must be held to its choice," ... for the Arizona Supreme Court has authoritatively determined that the State has chosen not to treat premeditation and the commission of a felony as independent elements of the crime, but rather whether Arizona's choice is unconstitutional.

*Schad*, 501 U.S. at 637, 111 S.Ct. 2491 (internal citation omitted).

To determine whether Arizona's "choice" was consistent with due process, a plurality of the Court referred "both to history and to the current practice of other States." *Id.* at 640, 111 S.Ct. 2491. The plurality also indicated that where statutory alternatives constitute alternative means of committing a single offense, the alternatives must reflect "notions of equivalent blameworthiness or culpability." *Id.* at 644, 111 S.Ct. 2491. In his concurrence, Justice Scalia disputed that the plurality engaged in an evaluation of "moral equivalence," contending that the plurality's analysis "ultimately relies upon nothing but historical practices." *Id.* at 651, 111 S.Ct. 2491 (Scalia, J., concurring); *see also State v. Fortune*, 128 Wash.2d 464, 909 P.2d 930, 933 (1996) (noting that "the plurality's

approval of Arizona's alternative means for first degree murder rested *entirely* upon an analysis of history and modern practice.") (emphasis in original). The plurality ultimately concluded that Arizona's "choice" to define these statutory alternatives as alternative means of proving first degree murder "did not fall beyond the constitutional bounds of fundamental fairness and rationality." *Id.* at 645, 909 P.2d 930.

*Schad* is widely understood to stand *not* for the proposition set forth in the majority opinion, but rather for the proposition that the Due Process Clause of the United States Constitution does not require jury unanimity on alternative means of proving a single offense. *See, e.g., State v. Derango*, 236 Wis.2d 721, 613 N.W.2d 833, 841 (2000); *State v. Nunez*, 133 Idaho 13, 981 P.2d 738, 744 (1999); *Ex Parte Madison*, 718 So.2d 104, 106–07 (Ala.1998); *Correa*, 696 A.2d at 958; *People v. Rand*, 291 Ill.App.3d 431, 225 Ill. Dec. 580, 683 N.E.2d 1243, 1249 (1997); *State v. St. Pierre*, 693 A.2d 1137, 1139 (Me.1997); *State v. Salazar*, 123 N.M. 778, 945 P.2d 996, 1006 (1997); *Richardson v. State*, 673 A.2d 144, 146–47 (Del.Supr.1996). For this reason, criminal defendants attempting to distinguish *Schad* have argued that their particular state legislature did not intend to create statutory alternatives, but rather intended to define separate and distinct offenses. *See, e.g., Fortune*, 909 P.2d at 931 (Wash.1996) (On facts "nearly identical" to those in *Schad*, the criminal defendant argued that "the Washington Legislature did not intend to make premeditated murder and felony murder alternative ways of establishing the *mens rea* element of first degree murder."). The Supreme Court of Oregon has explained: "The Supreme Court of the United States determined in *Schad* that different statutory offenses require separate verdicts, but that *the question whether statutory alternatives amount to separate offenses is best answered by an inquiry into legislative intent* [.]" *State v. King*, 316 Or. 437, 852 P.2d 190, 193 n. 6 (1993) (emphasis added).

Notwithstanding the foregoing, the majority in *Klinge* made the following erroneous statement, which the majority relies upon in this case: "[*Schad* ] set forth a test for deter-

mining whether alternative mental states merely constitute a means of satisfying a single *mens rea* element, or instead create separate crimes requiring individual proof." 92 Hawai'i at 586, 994 P.2d at 518. The majority in *Klinge* further concluded that "[t]he appropriate test under *Schad* appears to be whether the level of verdict specificity required by the instructions was rational and fair, considering history and practice, and the degree of 'blameworthiness and culpability." 92 Hawai'i at 586–87, 994 P.2d at 518–19 (citing *Schad,* 501 U.S. at 637, 111 S.Ct. 2491). The majority continues to misread and misapply *Schad* in this case. The issue that the majority confronts in III.B.2.a, *supra,* is whether alternative theories of guilt define separate crimes or may be treated as alternative means of establishing elements of a single offense. Majority opinion at 174, 29 P.3d at 364. In my view, this issue is one of statutory interpretation, *see Schad,* 501 U.S. at 636, 111 S.Ct. 2491, and our inquiry should focus, first and foremost, on legislative intent. *Kaiama,* 67 Haw. at 554, 696 P.2d at 842.

Nevertheless, the majority resorts to " 'history and practice' in Hawai'i and other jurisdictions, and whether the alternatives 'reasonably reflect notions of equivalent blameworthiness and culpability.' " Majority opinion at 174, 29 P.3d at 364 (citing *Klinge,* 92 Hawai'i at 587–89, 994 P.2d at 519–21). Applying this test, the majority engages in a wide-ranging analysis. Quite properly, the majority looks to "[t]he language and history of the relevant statutory provisions[.]" Majority opinion at 174, 29 P.3d at 364. Quite unnecessarily, the majority considers the "history and practice in other jurisdictions." Majority opinion at 175, 29 P.3d at 365.

To demonstrate the absurdity of the majority's position, I emphasize two points. First, this is the very analysis employed by a plurality of the United States Supreme Court in concluding that premeditated murder and felony murder may be alternative means of proving first degree murder. *See Schad,* 501 U.S. at 645, 111 S.Ct. 2491. While I presume that the majority would agree that such is not the case in Hawai'i, it employs a test that purportedly leads to such a result.[5] Second,

---

**5.** Notwithstanding the fact that Hawai'i does not recognize the offenses of felony murder and premeditated murder, a strict application of the *Schad* analysis leads to such a result. The conclusion in *Schad* did not turn upon statutory construction, for the plurality deferred to Arizona law in this regard. Accordingly, unless the plurality's analysis of history and practice are erroneous, the *Schad* analysis should, in fact, lead to the conclusion that felony murder and premeditated murder are alternative means of proving the single offense of first degree murder.

This conclusion underscores that, while the majority purports to apply a *Schad* analysis, it does not actually do so. The majority begins its analysis, for example, with a discussion of "[t]he language and history of the relevant statutory provisions[.]" The foregoing is not part of the *Schad* analysis. *See Id.* at 637–645. Application of the *Schad* analysis would have the majority look, rather, to the history of states generally treating the statutory alternatives as alternative means. *Id.* The majority's inquiry of "widespread practice" is limited to cases from two jurisdictions. And the majority does not discuss the "moral equivalence" of the alternatives. Accordingly, as I read it, the majority actually relies primarily upon legislative history, as manifested in the language and history of the relevant statutory provisions, in reaching its conclusion.

With respect to Hawai'i's first degree murder statute, I note that a proper application of the

*Schad* analysis would certainly lead to the conclusion that the five means of proving the offenses enumerated in HRS § 707–701(1) (1993) are but alternative means of proving the offense of first degree murder. HRS § 707–701(1) instructs that:

(1) A person commits the offense of murder in the first degree if the person intentionally or knowingly causes the death of:

(a) More than one person in the same or separate incident;

(b) A peace officer, judge, or prosecutor arising out of the performance of official duties;

(c) A person known by the defendant to be a witness in a criminal prosecution;

(d) A person by a hired killer, in which event both the person hired and the person responsible for hiring the killer shall be punished under this section; or

(e) A person while the defendant was imprisoned.

In my view, the foregoing were not intended by the legislature to be alternative means of proving first degree murder. Indeed, they have never been treated as such in this jurisdiction, and the requisite mental state for each of the foregoing offenses differs. Nevertheless, with the possible exception of subsection (1)(a), application of the *Schad* "test"—to use the majority's word—would lead to such a result. As the *Schad* court noted, there is "substantial historical and contemporary

**188**

this court has repeatedly recognized that it may accord greater protection to criminal defendants under the Hawai'i Constitution than that conferred under the United States Constitution. *See, e.g., State v. Mendoza*, 82 Hawai'i 143, 146, 920 P.2d 357, 360 (1996) (citing *State v. Wallace*, 80 Hawai'i 382, 397 n. 14, 910 P.2d 695, 710·n. 14 (1996) (citing *State v. Texeira*, 50 Haw. 138, 142 n. 2,.433 P.2d 593, 597 n. 2 (1967))). Inasmuch as the analysis employed by the plurality in *Schad* concluded that the Due Process Clause of the United States Constitution does not preclude a state from employing a statute by which premeditated murder and felony murder are but alternative means of proving a single offense, I submit that Article I, sections 5 and 14 of the Hawai'i State Constitution may mandate a different result.

In sum, I fail to the see how the majority can extract from *Schad* an analysis utilized to determine the *outside limits* of a states' power to define statutory alternatives as alternative means of proving a single offense, *see Schad*, 501 U.S. at 637, 111 S.Ct. 2491, and transform that standard into the test to be applied to ascertain the intent of the Hawai'i legislature in enacting the Hawai'i Penal Code.[6]

## II. The correct analysis for determining whether statutory alternatives constitute separate offenses or alternative means of proving a single offense

In my view, a more appropriate analysis for determining whether statutory alternatives constitute alternative means or separate offenses can be found in *United States v. UCO Oil Co.*, 546 F.2d 833 (9th Cir.1976), in which the United States Court of Appeals for the Ninth Circuit addressed this issue. The

Ninth Circuit articulated the following four factors: (1) the language of the statute; (2) the legislative history; (3) the nature of the proscribed conduct; and (4) the appropriateness of multiple punishment for the conduct charged in the indictment. *Id.* at 836–37; *see also State v. James*, 698 P.2d 1161, 1165–67 (Alaska 1985). Applying these factors, I conclude that the alternative theories of guilt presented to the jury in the instant case represent alternative means of proving a single offense.

The first factor to be considered is the language of the statute itself. *UCO Oil*, 546 F.2d at 836. The defendant in this case was charged with numerous sexual assault offenses. HRS § 702–205 instructs that:

> The elements of an offense are such (1) conduct, (2) attendant circumstances, and (3) results of conduct, as:
>
> (a) Are specified by the definition of the offense, and
>
> (b) Negative a defense (other than a defense based on the statute of limitations, lack of venue, or lack of jurisdiction).

I agree with the majority that, pursuant to HRS § 702–205(a), the prosecution was required to prove lack of consent as an element of the offenses charged in Counts I, II, and IV. I also agree that, with respect to the offense charged in Count III, and pursuant to HRS § 702–205(b), the prosecution was required to disprove the defense of consent. HRS chapter 702 discloses two means by which the prosecution may disprove the defense of consent. On the one hand, the prosecution may demonstrate that the Complainant did not consent to the sexual contact:

practice" treating felony murder and premeditated murder as alternative means of satisfying a *mens rea* requirement of high culpability. *Id.* at 640. Indeed, subsections (1)(b) through (e) would certainly fall within the scope of Arizona's first degree murder statute. *See infra* note 3. Causing the death of a prosecutor, judge, or witness, or utilizing a hired killer also likely reflect notions of equivalent "blameworthiness and culpability." *Id.* at 644, 111 S.Ct. 2491. In sum, if the majority has really adopted *Schad* as the test to determine whether statutory alternatives delineate alternative means of proving a single offense, it has wrought great change upon

this jurisdictions's traditional understanding of offenses set forth in the Hawai'i Penal Code. If not, reference to the *Schad* test will continue to cause confusion in how we apply *Arceo*.

6. The analysis employed by the majority would be appropriate ·if the defendant in this case claimed that treating the lack of consent and the presence of ineffective consent as statutory alternative means of proving the underlying offenses with which he was charged violated his right to due process of law, as guaranteed by the fourteenth amendment to the United States Constitution. *See generally Schad*.

In any prosecution, the victim's consent to the conduct alleged, or to the result thereof, is a defense if the consent negatives an element of the offense or precludes the infliction of the harm or evil sought to be prevented by the law defining the offense.

HRS § 702-233 (1993). On the other hand, the prosecution may establish that any apparent consent was ineffective:

Unless otherwise provided by this Code or by the law defining the offense, consent does not constitute a defense if:

(1) It is given by a person who is legally incompetent to authorize the conduct alleged; or

(2) It is given by a person who by reason of youth, mental disease, disorder, or defect, or intoxication is manifestly unable or known by the defendant to be unable to make a reasonable judgment as to the nature or harmfulness of the conduct alleged; or

(3) It is given by a person whose improvident consent is sought to be prevented by the law defining the offense; or

(4) It is induced by force, duress or deception.

HRS § 702-235 (1993).

A plain reading of the foregoing reveals that the statutory alternatives are not separate offenses. HRS § 702-205 indicates that both sections 702-233 and 702-235 are alternative means by which the prosecution might prove one of three requisite "elements" of an offense. *See* HRS § 702-205. It follows that these provisions are not, themselves, an "offense."

Common sense dictates a similar result. HRS §§ 702-233 and 702-235 describe mutually exclusive attendant circumstances. It should thus be impossible for the prosecution to disprove the defense of consent by one means without simultaneously rendering the alternative an impossibility. That these statutory alternatives cannot co-exist suggests that they are not independent offenses.

The second factor to be considered in determining whether statutory alternatives create separate and distinct offenses is legislative history and statutory context. *UCO Oil,*

546 F.2d at 837. With respect to statutory context, the various offenses recognized by the Hawai'i Penal Code are set forth in HRS chapters 707 through 712. As the majority explains, HRS §§ 702-233 and 702-235 are not located within any of these chapters, but rather found in HRS chapter 702, entitled "General Principles of Penal Liability." Majority opinion at 174, 29 P.3d at 364. Presumably, had the legislature intended the foregoing statutory alternatives to constitute independent offenses rather than alternative means of proving a single offense, they would be placed within one of the several chapters of the code defining such offenses.

Moreover, and as the majority explains, HRS §§ 702-233 and 702-235 are based on Model Penal Code section 2.11 (1962), which explains that the concept of consent must be analyzed separately in the context of the particular offenses to which they apply. Majority opinion at 174-75, 29 P.3d at 364-65.

The third factor to be considered is the nature of the proscribed conduct itself. *UCO Oil,* 546 F.2d at 837. The proscribed conduct in this case is the commission of sexual assault in the second, third, and fourth degrees. Our inquiry must therefore turn on whether the nature of the proscribed conduct differs upon application of the two statutory alternatives. In this case, it does not. Both sexual assault committed in the absence of consent and sexual assault committed following ineffective consent fall well within the conventional understanding of sexual assault. In fact, for purposes of HRS § 702-205, the alternative methods of disproving the defense of consent, as defined in sections 702-233 and 702-235, merge into the statutory definition of the underlying criminal offense as "attendant circumstances." As the majority explains, "it is not significant that the jury may have reached different conclusions regarding whether Complainant did not consent or any apparent consent was ineffective, *i.e.,* meaningless, because such differences do not reflect disagreement as to the specific incident charged." Majority opinion at 176, 29 P.3d at 366.

The fourth factor concerns the appropriateness of multiple punishment for the con-

duct charged in the indictment. *UCO Oil,* 546 F.2d at 837. Inasmuch as the absence of consent and the presence of ineffective consent are mutually exclusive concepts, this factor is not implicated in the instant case. Moreover, principles of double jeopardy would undoubtedly preclude a defendant punished for committing sexual assault absent consent from being prosecuted for the same incident, alleging on the second go-around the presence of ineffective consent, and vice versa. *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932); *State v. Lessary,* 75 Haw. 446, 865 P.2d 150 (1994).

### III. Conclusion

For the foregoing reasons, I agree with the majority that the alternative theories of absence of consent and ineffective consent do not represent separate crimes, but rather alternative means of proving the attendant circumstance element of a single crime. Therefore, while I do not join section III. B.2.a. of the opinion, I concur with the majority's disposition of this appeal.