OPINION
{¶ 1} This matter is before the Court on the Notice of Appeal of Jason Nichols, filed January 25, 2008. On September 20, 2006, Nichols was indicted on one count of endangering children (serious physical harm), in violation of R.C. 2919.22(B)(1), a felony of the second degree. Nichols pled not guilty on October 5, 2006, and on December 4, 2006, he filed a *Page 2 
Motion to Suppress Statements. Nichols withdrew his motion to suppress on April 5, 2007, and then on November 9, 2007, Nichols filed a Motion to Reinstate Motion to Suppress. The matter was referred to the visiting judge for the purpose of conducting a hearing on the motion to suppress. On September 11, 2007, Nichols withdrew his not guilty plea and entered a plea of no contest. On October 9, 2007, in response to Nichols' Motion to Withdraw Plea, the trial court issued an Order providing, "it is hereby ordered that the plea of guilty entered on September 11, 2007 in the above captioned matter be withdrawn." On November 9, 2007, Nichols' motion to suppress was overruled following a hearing on the same day. Following a jury trial, Nichols was convicted as charged, and he was sentenced to five years in prison.
 {¶ 2} The victim herein is Nichols' daughter, who was born on June 26, 2006. Nichols and the baby's mother, Ashley Scott, resided together in Dayton, Ohio. No one other than Nichols and Scott provided care for the baby. When Scott returned to work at Kroger's, on August 14, 2006, Nichols became the baby's primary care giver. On August 18, 2006, as Scott prepared to go to work, Nichols gave the baby a bottle and proceeded to change her diaper. Scott heard her daughter cry, and when she turned around, she observed Nichols holding a diaper, and she also observed "like three fat rolls underneath [the baby's] left buttock." According to Scott, when she turned her daughter over, the baby's left leg "just fell. It didn't do nothing."
 {¶ 3} Scott testified that Nichols called the hospital, but "they didn't understand what he was talking about, so he called the family doctor and she said to bring her in." Scott and Nichols took the baby to the doctor's office, and the doctor gave the baby some Tylenol and then referred Scott and Nichols to the radiology department at Children's Medical Center. An *Page 3 
X-ray performed there revealed a left femoral fracture, and the baby was sent to the emergency department for further evaluation and was ultimately admitted to intensive care.
 {¶ 4} Dr. Raul Chabali, a specialist in pediatric emergency medicine, testified that, in addition to the "obvious palpable and visible deformity" of the baby's left thigh, he initially observed a bruise on the baby's left cheek. According to Chabali, the femoral fracture was "well under" a week old and could have occurred within the last 24 hours. Neither parent could account for the fracture, and Chabali testified that Nichols "became very angry" and "continued to talk without interruption saying that we were all trying to make them look like they had done something they hadn't done and that we weren't going to do that to them." Chabali felt "rather unsafe" in Nichols' presence and alerted security.
 {¶ 5} Chibali testified that a skeletal survey and a CAT scan were performed, and the results indicated that the baby had multiple fractures, all in her legs, and all in different stages of healing. Specifically, Chibali found an additional acute "incomplete left tibial growth plate area fracture," an "acute incomplete left fibular growth plate fracture," a "distal left fibular fracture," and a "right thigh bone growth plate area fracture." According to Chibali, "the tibial metaphysis fractures * * * are essentially exclusively seen with abuse, not with falls or other types of trauma." Chibali testified that the injuries appeared to be intentionally inflicted.
 {¶ 6} Dr. Ann Burke, a pediatrician at Children's Medical Center, testified that she cared for the baby upon her release from intensive care to a regular room in the hospital. Burke's main concern for the baby was pain management and follow up care. She also ordered genetic testing of the baby, and she found that the results were negative for osteogenisis imperfecta, or brittle bone disease. *Page 4 
 {¶ 7} Officer Theresa Leanne Lawson, a detective in the Dayton Police Department's Special Victim's Unit, interviewed Nichols on August 18, 2006. In the course of the interview, Nichols repeated several times to Lawson, "I will lose my job in the child care system if I admit to this." Nichols told Lawson that Scott did not harm the baby.
 {¶ 8} Officer Phillip Olinger, also a detective in the Dayton Police Department's Special Victim's Unit, interviewed Nichols on August 21, 2006. Nichols did not directly admit to harming the baby, but in the course of the interview, he asked Olinger, "If I tell you what I did, will you give me a written guarantee I won't go to prison?" Nichols told Olinger that he had never seen Scott abuse the baby.
 {¶ 9} Nichols asserts two assignments of error. Nichols' first assignment of error is as follows:
 {¶ 10} "THE TRIAL COURT COMMITTED PREJUDICIAL ERROR IN VIOLATION OF THE DUE PROCESS CLAUSE OF THE U.S. CONSTITUTION WHEN IT FAILED TO ADEQUATELY ADDRESS AN OBJECTION AFTER AN EXPERT WITNESS OPINED THAT THERE WAS NO `REASONABLE DOUBT' THAT THE CHILD'S INJURIES WERE ANYTHING OTHER THAN THE RESULT OF PHYSICAL ABUSE."
 {¶ 11} The following exchange occurred during Dr. Burke's direct testimony regarding genetic testing of the baby for osteogenisis imperfecta:
 {¶ 12} "Q. And are you aware of the results with regard to this — this child * * * ?
 {¶ 13} "A. Yes. They were negative.
 {¶ 14} "Q. And when you say negative, can you tell us what you mean by that, please?
 {¶ 15} "A. That they did not find any mutations that they test for on that. It does not *Page 5 
specifically rule out osteogenisis imperfecta, but it makes it very unlikely.
 {¶ 16} "Q. And when you say very unlikely, can you qualify that or quantify that?
 {¶ 17} "A. To the best of my ability, I would say about 95 percent disqualifies that as a diagnosis.
 {¶ 18} "Q. Okay. And if you further want to disqualify that, is there any additional testing that could be done?
 {¶ 19} "A. To continue to check x-rays of the child and see if there are continuing fractures.
 {¶ 20} "Q. Okay.
 {¶ 21} "A. Because with osteogenisis imperfecta, even with careful handling of an infant, there would most likely over time be further fractures.
 {¶ 22} "Q. Okay. So the biggest indicator, in your opinion, would be if there is additional fractures after this test was complete?
 {¶ 23} "A. Yes.
a. * *
 {¶ 24} "Q. And, Doctor, if it was brought to your attention that there were no additional fractures to this child after this genetic testing was completed, would that change your opinion, or what would your opinion be?
 {¶ 25} "A. Well, my opinion would continue to be that in this case by far and away the most likely diagnosis is child maltreatment or inflicted trauma. But it would make me have any reasonable doubt of that diagnosis put further away because of — if there were no — your question was if there were no continued fractures it would make osteogenisis imperfecta — *Page 6 
 {¶ 26} "MR. DAGANHART: Your Honor, I'm going to object here. I think she's invading on the province of the jury when she's putting a legal term in with whatever she's done by way of —
 {¶ 27} "THE COURT: I think I understand your objection.
 {¶ 28} "MR. DAGANHART: diagnosis and treatment.
 {¶ 29} "THE COURT: Counsel, could you maybe clarify what she's saying. She gave us an opinion in a real long sentence.
a. * *
 {¶ 30} "THE COURT: And I think you need to — I think you need to segment that, if you will.
 {¶ 31} "BY MR. ABSHIRE:
 {¶ 32} "Q. Dr. Burke, if you have evidence in front of you that this child that was tested for brittle bone, osteogenisis imperfecta, had no additional fractures after she was seen at CMC, would that impact your testimony or your opinion as to whether or not she had brittle bone?
 {¶ 33} "A. It would not change my opinion."
 {¶ 34} According to Nichols, "an expert may not testify about his or her interpretation of the law, because that issue is a jury question," and "by telling the jury that she had no `reasonable doubt' that the cause of the child's injuries was not due to brittle bone disease, the expert unwittingly provided a prohibited legal opinion on the merits of the defense. And while the trial court recognized the error it did not correct it. * * * But by not sustaining the objection, and by not instructing the jury to disregard that part of the testimony, the court impliedly freed the jury to consider the doctor's legal opinion that there was no `reasonable doubt' that these *Page 7 
injuries were anything other than inflicted." Nichols argues that prejudicial error resulted.
 {¶ 35} The State counters, "even if Burke's testimony went to an ultimate issue to be decided by the jury, it was not an inadmissible legal opinion. Evid. R. 704. In fact, Burke's testimony was not a legal conclusion at all since she did not opine as to whether there was reasonable doubt that Nichols abused [his daughter]. Therefore, Dr. Burke did not invade the province of the jury when she used the words reasonable doubt to discuss the impact of the lack of fractures in [the victim's] bones subsequent to August 18, 2006 upon the level of certainty of her medical opinion."
 {¶ 36} Nichols replies, Dr. Burke "told the jurors that they could rest assured that one of Appellant's defenses — that the child suffered from brittle bone disease — was untrue. And the trial court's failure to advise the jury that the expert opinion should not be considered a legal opinion allowed the jury to dismiss that defense."
 {¶ 37} Having reviewed the above exchange and the entirety of the record, we see no prejudicial error. Evid. R. 702 and 704 allow expert opinion on the ultimate issue for jury determination if the witness is "qualified as an expert by specialized knowledge, skill, experience, training, or education," and such qualifications will aid the jury in understanding the evidence and reaching a decision. Evid. R. 705 provides that an "expert may testify in terms of opinion or inference and give the expert's reasons therefor after disclosure of the underlying facts or data. The disclosure may be in response to a hypothetical question or otherwise."
 {¶ 38} Dr. Burke was asked a hypothetical question, albeit an inartful one. Her partial response suggests any reasonable doubt she had regarding abuse would only be diminished by *Page 8 
evidence of no further injuries once the baby was outside the custody of Nichols. Her use of the term reasonable doubt is unfortunate and the court should have sustained an objection to avoid any confusion on the part of the jury. However, the court permitted clarification of Dr. Burke's opinion upon objection. The clarifying response made no reference to the term reasonable doubt. Dr. Burke merely reiterated her expert opinion that the baby suffered injuries consistent with abuse. We note, Nichols did not move to strike Dr. Burke's testimony, request a cautionary instruction or request a mistrial. We conclude that Dr. Burke did not offer a legal opinion regarding guilt or innocence but rather an expert medical opinion relating only to her medical diagnosis of abuse. Her opinion was elicited solely to aid the jury in understanding the nature of the baby's injuries. Dr. Burke possessed the requisite skill and training to opine that the baby's injuries were neither accidental nor the result of brittle bone disease. There being no prejudicial error and no merit to Nichols' first assignment of error, it is overruled.
 {¶ 39} Nichols' second assignment of error is as follows:
 {¶ 40} "THE TRIAL COURT COMMITTED PLAIN ERROR BECAUSE IT DID NOT INSTRUCT THE JURORS THAT THEY HAD TO UNANIMOUSLY AGREE THAT A PARTICULAR ACT WAS THE BASIS FOR THE CONVICTION."
 {¶ 41} Nichols argues, "the jury's verdict should be reversed because this court cannot know that the jury's decision was unanimous," in reliance upon State v. Johnson (1989), 46 Ohio St.3d 96, 545 N.E.2d 636. Nichols initially argues that plain error analysis applies, but he then concludes, "the error here should be deemed `structural.'"
 {¶ 42} In Johnson, the defendant upon remand was convicted of aggravated murder and aggravated robbery, and the court of appeals affirmed. Johnson argued to the Supreme Court of *Page 9 
Ohio that "`[w]here * * * the verdict * * * may have been predicated on one of two or more alternative theories submitted to the jury' it was error for the trial court not to instruct the jury specifically that it must concur unanimously on at least one of the alternatives if it was to convict." Id., at 644. Johnson pointed to the "disjunctive nature of the trial court's instructions" and argued that he was prejudiced thereby, "since the verdict had the potential of being less than unanimous on a particular theory of guilt."[1] Id. According to Johnson, "he could have been convicted by less than a unanimous jury since some of the jurors could have found that he murdered [the victim] while committing aggravated robbery, some that he murdered her while attempting to commit aggravated robbery, some that he murdered her while fleeing immediately after committing aggravated robbery, and some that he murdered her while fleeing after attempting aggravated robbery." Id.
 {¶ 43} The Supreme Court of Ohio began its analysis with "the assumption that, `when a jury returns a guilty verdict on an indictment charging several acts in the conjunctive * * * the verdict stands if the evidence is sufficient with respect to any one of the acts charged.'" Id. (Internal citations omitted). The court noted that a general unanimity instruction is sufficient in such a case. Id. The court distinguished such a case from one in which "a single count can be divided into two or more `distinct conceptual groupings,'" in which case "the jury must be *Page 10 
instructed specifically that it must unanimously conclude that the defendant committed acts falling within one such grouping in order to reach a guilty verdict." Id. (Internal citations omitted). TheJohnson Court determined in the matter before it, "even assumingarguendo that the jury had split on the alternatives offered by the specification, each juror still would have agreed that the appellant had murdered [the victim] in conjunction with at least attempting to commit aggravated robbery, and this alone would have been adequate to sustain the conviction." Id., at 645. The Court determined that the "jury was faced with a `single conceptual grouping of related facts,' rather than two or more `distinct conceptual groupings.' (Internal citation omitted)." Id. In other words, "the alternatives presented to the jury and charged in the specifications were not conceptually distinct. Therefore, a `patchwork' of less than unanimous verdict was not possible." Id. According to Nichols, "[u]nder the reasoning ofJohnson, a jury should be instructed in this situation that it has to agree about the particular conduct or event underlying the conviction. Here there was no such instruction."
 {¶ 44} The state responds, "no error occurred when the trial court gave only a general unanimity instruction rather than a special instruction that all twelve members were required to agree upon the same leg fracture as constituting proof beyond a reasonable doubt" that Nichols abused his daughter, in reliance upon State v. Gardner (2008),118 Ohio St.3d 420, 889 N.E.2d 995, 2008-Ohio-2787. In Gardner, the defendant was convicted of aggravated burglary with a firearm specification, and we vacated the conviction. On the State's appeal, the issue before the Supreme Court of Ohio was "whether the jurors must agree unanimously as to which criminal offense a defendant intended to commit during a burglary." Id., at ¶ 37. The court noted, "[i]n *Page 11 
determining whether the state has impermissibly interfered with a defendant's Crim. R. 31(A) right to juror unanimity and the due process right to require that the state prove each element of the offense beyond a reasonable doubt, the critical inquiry is whether the case involves `alternative means' or `multiple acts.'" Id., at ¶ 48.
 {¶ 45} Quoting State v. Jones (2001), 96 Hawaii 161, 170, 29 P.3d 351, and the cases cited therein the Supreme Court of Ohio noted, "`In an alternative means case, where a single offense may be committed in more than one way, there must be jury unanimity as to guilt for the single crime charged. Unanimity is not required, however, as to the means by which the crime was committed so long as substantial evidence supports each alternative means. * * *
 {¶ 46} "`In multiple acts cases, on the other hand, several acts are alleged and any one of them could constitute the crime charged. In these cases, the jury must be unanimous as to which act or incident constitutes the crime. To ensure jury unanimity in multiple acts cases, we require that either the State elect the particular criminal act upon which it will rely for conviction, or that the trial court instruct the jury that all of them must agree that the same underlying criminal act has been proved beyond a reasonable doubt.'" Id., at ¶ 48-49. The Court further noted that "there has been criticism of the `distinct conceptual groupings' rubric," but concluded, "the multiple-acts analysis remains a viable and valuable tool for state courts in their consideration of jury-unanimity questions." Id., at ¶ 56.
 {¶ 47} According to the State, "the single count of endangering children appears to fall into the category of `multiple acts cases' * * * [but] a special instruction regarding unanimity was not required here because the count could be divided into a single conceptual grouping of related facts, meaning the alternatives presented to the jury were not conceptually distinct." *Page 12 
 {¶ 48} In Reply, Nichols argues that Gardner supports his position, asserting that the matter herein "is a multiple acts case." According to Nichols, under "Gardner, the State is required to elect which fracture is the basis for the charge, or else the jury must be instructed that it has to agree unanimously on the underlying criminal act."
 {¶ 49} Finally, Nichols argues his conviction violates Crim. R. 31(A). Crim. R. 31(A) requires a unanimous verdict in criminal cases. "A criminal defendant is entitled to have the trial court give the jury complete and accurate instructions on all of the issues of law raised by the evidence. (Internal citations omitted). Defendant's failure to object to any of the jury instructions about which [he] complains on appeal waives all but plain error. (Internal citation omitted). Plain error does not exist unless but for the error, the outcome of the trial clearly would have been otherwise." State v. Powell, Montgomery App. No. 22049, 2008-Ohio-1316, ¶ 13.
 {¶ 50} Nichols was convicted of endangering children, in violation of R.C. 2919.22(B)(1), which provides, "No person shall do any of the following to a child under eighteen years of age * * * (1) Abuse the child." The trial court instructed the jury as follows without objection: "Abuse means any act which causes physical or mental injury that harms or threatens to harm the child's health or welfare. * * * Serious physical harm to persons means any of the following. Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary substantial incapacity. Any physical harm that involves some permanent disfigurement, whether it involves some temporary serious disfigurement or any physical harm which involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain. * * * [Y]our *Page 13 
verdict has to be unanimous. You all have to concur in the verdict. * * * whenever all 12, and I repeat all 12, jurors agree upon a verdict, you'll sign the verdict in ink * * * ." See 4 Ohio Jury Instructions § 519.22(5); R.C. 2151.031(D); R.C. 2901.01(A)(5).
 {¶ 51} R.C. 2919.22(B)(1) does not proscribe a single crime that may be committed by alternative statutory means, as in Johnson. Nor do we need to determine, as discussed in Gardner, whether the count against Nichols can be divided into a "single conceptual grouping of related facts" or if multiple-acts analysis applies. Our review is limited since Nichols, in failing to object to the instructions as given, waived all but plain error, and this is not a structural error case as Nichols asserts. Powell. Nichols was charged with abusing his daughter between the dates of the baby's birth and August 18, 2006, when she was taken to the hospital. Evidence was adduced that the victim suffered multiple fractures, which were in various stages of healing, within the time period set forth in the indictment. The State emphasized her most recent injury, which was established beyond a reasonable doubt. Plain error is not demonstrated. Nichols' second assignment of error is overruled. The judgment of the trial court is affirmed.
WOLFF, P.J. and GRADY, J., concur.
Copies mailed to:
R. Lynn Nothstine
Jon Paul Rion
Hon. Mary Katherine Huffman
[1] The Johnson court instructed the jury as follows on the aggravated robbery specification: "the State charges in Specification No. 1 that the defendant, Gary Johnson, committed the offense of aggravated murder * * * while the defendant was committing or attempting to commit, or while fleeing immediately after committing or attempting to commit the offense of aggravated robbery." The instruction on aggravated robbery was as follows: "Before you can find the defendant, Gary Johnson, guilty of aggravated robbery * * * as charged in the second count of the indictment, you must find beyond a reasonable doubt that * * * the defendant did, in attempting or committing a theft offense, or in fleeing immediately after such attempt or offense, * * * have a deadly weapon." *Page 1